COUNSEL FOR RESPONSIBLE NUTRITION and
ANNETTE DICKINSON

v.

HARTFORD CASUALTY INSURANCE COMPANY

PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
-------------------------------------------------------------X
CONSUMERLAB.COM, LLC, a New York
Limited Liability Company,

                          Plaintiff,                          **VERIFIED COMPLAINT**

         - against -
                                                              Index No. 05-04998
THE COUNCIL FOR RESPONSIBLE NUTRITION,
a District of Columbia Not-For-Profit Corporation,            Date Purchased: 4/5/05
ANNETTE DICKINSON, an individual resident
of Maryland, and JOHN AND JANE DOE (1-20),

                          Defendants
-------------------------------------------------------------X

         Plaintiff, CONSUMERLAB.COM, by its attorneys, Cooperman Lester Miller LLP, as

and for its Complaint against Defendants, alleges as follows:

### *PARTIES, JURISDICTION, AND VENUE*

         1.       Plaintiff, ConsumerLab.com, is a limited liability company organized under

the laws of the State of New York and, at all times pertinent to this action, has its principal

place of business in Westchester County, New York.  Plaintiff is a leading independent

evaluator of health and nutrition products.

         2.       Upon information and belief, defendant, the Council for Responsible Nutrition

(hereinafter "Defendant CRN" or "CRN") is a domestic not-for-profit corporation organized

under the laws of the District of Columbia, and at all times pertinent to this action, had its

principal place of business in the District of Columbia.  Defendant CRN is a trade association

whose membership consists of suppliers and manufacturers of vitamins and dietary

supplements and also includes two associate members which are competitors of Plaintiff.

1

3.    Defendant Annette Dickinson (hereinafter "Defendant Dickinson" or "Dickinson") is an individual and, upon information and belief, at all times pertinent to this action has been a citizen of and resident of the State of Maryland, residing in Mount Airy, Maryland.

4.    The term "Defendants," as used herein refers to both Defendant CRN and Defendant Dickinson and any others who are hereafter specifically named as defendants.

5.    Jurisdiction and venue in this action are proper. The Plaintiff is located in Westchester County, New York, within the jurisdiction of this Court, and the injury to the Plaintiff from the Defendants' tortious acts occurred in New York State. The damages sought are within the jurisdictional limits of this Court. The Defendants' tortious acts were reasonably known by them to reach within this jurisdiction and cause damage to the Plaintiff within this jurisdiction, and the Defendants are thereby properly subject to this Court's long-arm jurisdiction.

6.    Headings or captions contained in this Complaint are for orientation and organizational purposes only and do not form a substantive limitation on the causes of actions alleged.

7.    Defendants have published and caused to be republished false and defamatory statements concerning Plaintiff. When used without limitation or specification, the term "defamatory statements" refers to all false and defamatory statements relating to Plaintiff contained within all the defamatory publications comprising Complaint Exhibits "A" through "C" annexed hereto, and shall apply to all causes of action alleged herein.

## *FACTUAL BACKGROUND*

8.      On or about January 12, 2005, Defendants filed a purported "Complaint" or "Request for Investigation" with the U.S. Federal Trade Commission (hereinafter "FTC") dated January 12, 2005 (hereinafter "CRN Complaint"). Defendant Dickinson signed the CRN Complaint under the letterhead of Defendant CRN. A copy of the CRN Complaint is attached hereto as Exhibit "A".

9.      Defendants posted a copy of the CRN Complaint on their web site.

10.     Defendants used the existence of the CRN Complaint for a broad-based media campaign, which included press releases, and which was intended to, and did, defame Plaintiff and cause damage to Plaintiff's business income and business reputation.

11.     The CRN Complaint was not intended as a truthful and legitimate complaint of claimed violations of the statutes and regulations for which the FTC is an enforcement agency but, instead, was a pretext to purposefully and maliciously initiate and conduct a widespread defamatory media campaign against the Plaintiff. To whatever extent Defendants' filing might otherwise have been subject to a qualified privilege, that privilege has been overcome, waived and nullified.

12.     Upon information and belief, prior to the acceptance by the FTC of the filing of the CRN Complaint, Defendants furnished advance copies of the CRN Complaint to certain news reporters, including a reporter for the Wall Street Journal which published an article about the CRN Complaint in the January 13th edition of the Wall Street Journal, which characterized the CRN Complaint as alleging that CL deceptively portrays itself as an independent laboratory acting as a watchdog for consumer interests.

3

13.     Upon information and belief, a principal purpose of Defendants' defamatory media campaign against CL was to silence CL and thereby cut off the flow of legitimate consumer information published by CL in a misguided effort that by doing so Defendants would be shielding CRN's members from any adverse findings in CL's *bona fide* test results of products manufactured and distributed by CRN's members.

14.     The defamatory statements were made by Defendants with knowledge of the falsity of such statements or with reckless disregard of whether or not such statements were false.

15.     Defendants' Complaint defames Plaintiff by making the following false and defamatory statements:

(a)     **Enforcement Action against ConsumerLab.com.** (Caption which was underlined and bold in the original)

[Plaintiff submits that Defendants' caption was intended to mislead the reader into believing that CL was already the subject of an FTC enforcement action].

(b)     ConsumerLab's promotional activities are unfair and deceptive under section 5 of the Federal Trade Commission Act (FTC Act).

(c)     ConsumerLab has misled the media and the public into believing that it is providing the complete results of reliable testing for the benefit of all consumers.  Nothing could be further from the truth.  In fact, ConsumerLab is a for-profit enterprise pressuring manufacturers into using its services for its own financial gain.

(d)     First, ConsumerLab hides from the public the material fact that ConsumerLab requires supplement manufacturers to pay a fee to obtain favorable publicity for positive test results or to avoid unfavorable publicity for negative test results.

(e)     Second, ConsumerLab deceives the public by falsely implying that it operates a laboratory.

4

(f)   ConsumerLab claims to test dietary supplements independently and in the public interest. In fact, this is how the company's program really works.

- ConsumerLab approaches manufacturers and marketers of dietary supplements and offers them the "opportunity" to pay to be included in testing of a particular product or product category. One incentive for participating is that ConsumerLab only publicizes **adverse** test results from manufacturers who refuse to pay. If a dietary supplement fails to meet ConsumerLab's criteria and the company has paid to be in the program, then the negative results will not be publicized – that is, will not be included in press releases, in the public section of the ConsumerLab website to which the media and the general public have access, or even in the private section of the ConsumerLab website to which subscribers have access. (Underline and bold in the original.)

- Another incentive for companies to pay to participate in the program is that ConsumerLab only publicizes **positive** test results if a manufacturer accedes to ConsumerLab's demands for money.[6] Positive results for non-paying manufacturers are not listed on the public portion of the ConsumerLab website to which the general public has free access. (Underline and bold in the original.)

[6]   If a manufacturer has paid ConsumerLab the requested fee, ConsumerLab will include positive results for the manufacturer's products on the public section of the ConsumerLab website. Other passing products will not be mentioned on the public site for the sole reason that the manufacturer has refused to pay ConsumerLab. Non-paying products will be listed only in the private section of the website, available only to paid subscribers and to media for whom ConsumerLab may choose to provide a password.

- Despite its name and promotional materials, ConsumerLab has no testing laboratory. All dietary supplements are tested by unidentified laboratories under contract with ConsumerLab.

- The testing methodology used by the contract laboratories is not revealed in advance except to companies that pay for testing.

The result is that companies are pressured by ConsumerLab into paying a fee. Despite its name and its claims of independence, ConsumerLab is highly dependent on payments from industry. ConsumerLab hides what it is paid to hide and publicizes what it is paid to publicize.

5

(g)   Manufactures who refuse to give in to ConsumerLab's scheme will suffer even if their test results are positive, because competing manufacturers who pay the fee will have their positive test results publicized on the free section of the website. Those who do not give in will receive no publicity and will suffer from the fact that their products are omitted from the list of passing products, even if they passed the tests. Their products will be listed only in the section of the website to which the general public has no free access.

(h)   ConsumerLab's deceptive acts violate the FTC Act in two primary ways.   First, ConsumerLab misleads the public by failing to provide material information and by advertising itself as independent of the product manufacturers. Instead of truthfully informing the public that it quashes negative test results for manufacturers who give in to ConsumerLab's demand for payment, ConsumerLab falsely and fraudulently invites consumers to subscribe to the website in order to "find out which products failed our tests!"   Nor does ConsumerLab forthrightly tell consumers and the public that it only publicizes positive test results for those manufacturers who pay for that publicity. Instead, ConsumerLab states in each press release that the company "is a leading provider of consumer information and independent evaluations of products," and that it "has no ownership from, or interest in, companies that manufacture, distribute, or sell consumer products."

(i)   ConsumerLab's omission of material information and its claims of independence are likely to mislead consumers into believing that ConsumerLab is operating in the public interest and cannot be influenced by any outside party. In fact, ConsumerLab is operating in its own corporate interest and obtains substantial funding from industry.

(j)   Second, ConsumerLab deceives consumers into believing that ConsumerLab itself conducts product testing. Although the detailed description of the testing program mentions that contract labs are used, the language that appears prominently in press releases and elsewhere on the website strongly suggests that the company "tests" the products.

(k)   The name "ConsumerLab" itself deceptively suggests that the company operates a laboratory. As the FTC and the courts have recognized, a trade name can be deceptive if it states or implies that a product contains something that is absent from the product. Just as the FTC ruled that the trade name "Micro Silk" could not be used on blouses that do not contain silk, the name "ConsumerLab" is unacceptable for a company that does not operate a lab.   Indeed, the ConsumerLab name is so deceptive that excision may be warranted.

(l)   ConsumerLab's unfair and deceptive actions cause substantial injury to consumers as well as manufacturers. The deception directly affects consumers in their decision to purchase a subscription to the ConsumerLab website or to purchase a

book with the ConsumerLab name, as well as their choice of which dietary supplements to purchase. ConsumerLab's unscrupulous practices are particularly harmful both to consumers and to manufacturers because of mounting public interest in the quality of dietary supplements and because of the media attention commanded by ConsumerLab.

(m)     This entire business model represents and egregious form of consumer fraud and deception.

(n)     The Council for Responsible Nutrition and its member companies fully recognize the value and importance of legitimate third-party testing and verification programs that help consumers select high quality products and that operate in an honest and above-board manner. Two examples of such programs include those currently operated by the U.S. Pharmacopoeia and by NSF International. The ConsumerLab business model, by contrast, is unfair and deceptive.

(o)     Unless the CRN imposes the requirements outlined above, ConsumerLab will continue to operate in a fraudulent and deceptive manner.

(p)     We urge prompt investigation and swift enforcement to curtail ConsumerLab's unfair business practices.

16.     At about the same time as Defendants filed the CRN Complaint, they also posted the CRN Complaint on CRN's website and issued a press release on a public newswire citing to the internet address of the CRN Complaint on Defendants' web site (hereinafter "press release"). The press release further defamed Plaintiff with additional defamatory statements. A true and correct copy of the defamatory press release is attached hereto as Exhibit "B".

17.     Defendants posted a copy of their defamatory press release on their web site.

18.     Defendants' press release defames Plaintiff by making the following false, misleading and defamatory statements:

(a)     FTC URGED TO INVESTIGATE PURPORTED CONSUMER WATCHDOG – Trade association Petitions Agency to Stop ConsumerLab.com's Deceptive Business Practices –

7

(b)   The Council for Responsible Nutrition (CRN) has asked the Federal Trade Commission (FTC) to investigate deceptive business practices by ConsumerLab.com and take appropriate action.

(c)   The CRN complaint states that ConsumerLab.com – which represents itself as a consumer watchdog testing dietary supplements -- is in reality a for-profit company that solicits money from the makers of products it plans to have tested. Those that pay have positive results highlighted and negative results quashed; those that don't pay have negative results highlighted and positive results obscured.

(d)   "Until now, nobody has looked behind the curtain and exposed ConsumerLab's tactics," said CRN President Annette Dickinson, Ph.D. "It is a business, not a watchdog – one that intimidates manufacturers to pay for its services. We ask the FTC to lift the veil this company uses to disguise its true nature."

(e)   ConsumerLab.com promotes itself as "a leading provider of consumer information and independent evaluations of products that affect health and nutrition." Contrary to the image it projects of an actual testing facility, ConsumerLab.com essentially is a three-person operation, and its business address is a UPS drop box in White Plains, N.Y. It farms out product testing, but does not make public the identity of the laboratories it uses.

(f)   Here is how it works:   ConsumerLab.com approaches dietary supplement makers requesting that they enroll in its "voluntary" testing program – for a fee. Those that pay are guaranteed that products failing the subsequent testing will not be identified publicly. Companies that do not pay risk having their products tested anyway and, if they fail, being publicized on ConsumerLab.com's Web site and in the media.

(g)   Meeting ConsumerLab.com's standards is no guarantee that a manufacturer will be treated fairly. Only products from companies that pay up and pass are mentioned on the free portion of ConsumerLab.com's Web site. Products that pass but are made by companies that don't pay are listed only on the private portion of the site.   These products are absent from the public site, giving the impression to non-subscribers that they must have failed because they aren't listed. And even the 20,000 Web subscribers, who pay $24 a year for "full access" to product tests, aren't told that ConsumerLab.com has agreed to suppress failing results for companies that paid up.

(h)   CRN and its member companies recognize the value and importance of legitimate third-party testing programs – such as those run by U.S. Pharmacopoeia and NSF International -- that operate in an honest and aboveboard manner and help

consumers select high-quality products. The ConsumerLab.com business model, by contrast, is unfair and deceptive.

(i)     CRN is asking the FTC to make ConsumerLab.com: . . . 4) change its name to one that does not falsely imply that it does its own testing.

(j)     "ConsumerLab.com's entire business model is based upon threat and deception," Dr. Dickinson Said. "Forcing it to come clean will take away its ability to mislead the media and the public."

19.     On or about January 21, 2005, Defendants sent an additional defamatory letter to the FTC (hereinafter "Defamatory Letter"). The defamatory letter was addressed to Plaintiff, but copies were also sent to the Chairwoman and four (4) Commissioners of the CRN. A true and correct copy of the defamatory letter is attached hereto as Exhibit "C".

20.     The Defamatory Letter defames Plaintiff by making the following false and defamatory statements:

(a)     To pressure the companies to pay a fee to obtain maximum public exposure for positive results and to quash negative results amounts to a shake-down, which we are asking the FTC to stop.

(b)     The deception of consumers occasioned by this business model lied in leading the public to believe that ConsumerLab is independent of industry, which it is not, and that all test results are revealed, which they are not.

21.     By letter dated March 15, 2005 (a copy of which is annexed hereto as Exhibit "D"), the FTC staff, after noting the seriousness of the CRN Complaint (that "CL's entire business model represents an egregious form of consumer fraud and deception") determined not to recommend any FTC action.

22.     By letter dated and transmitted on March 15, 2005 (a copy of which is annexed hereto as Exhibit "E"), Cooperman Lester Miller LLP, attorneys for Plaintiff, urged

9

Defendants to immediately remove the CRN Complaint and other disparaging references to

CL from CRN's website, stating:

> On or about January 12, 2005 you, on behalf of the Council for Responsible Nutrition ("CRN"), filed a Complaint with the Federal Trade Commission ("FTC") against our client, ConsumerLab.Com ("CL"), labeled "Enforcement Action Against ConsumerLab.Com". At the same time you posted your complaint on your web site and issued a press release electronically linked to your web site. In your papers to the FTC you state as fact that CL engages in "false and fraudulent" and "unscrupulous" acts and practices, is involved in a "shakedown" and is in violation of the FTC Act.

> As you now know, the FTC, by letter to you dated March 15, 2005, has refused to take any enforcement or other action with respect to your complaint even though, as the FTC letter notes, your complaint "alleges that ConsumerLab's 'entire business model represents an egregious form of consumer fraud and deception.' "

> While we very much respect the right of concerned citizens to lodge *bona fide* complaints with governmental agencies, we believe that the charges which you filed against CL with the FTC, loaded as they were with inflammatory and defamatory characterizations and so widely disseminated by you, had as their essential purpose, to silence CL and wreak vengeance upon CL for disclosing the failings of some in your industry and, perhaps, benefit certain of CRN's associate members which are competitors of CL.

> We believe that what you have done is both legally and morally wrong. We also believe that a Court will find that your actions, and especially the simultaneous wide dissemination of the charges, were unlawful and defamatory and were maliciously designed to undermine CL and its business.

> As a direct result of your actions, CL has lost subscribers, manufacturers have withheld products for testing by CL, and CL's alliances and relationships have been jeopardized, all of which has caused untold damages to CL for which it will be commencing suit against CRN and you, as its executive director, and any others involved in what we believe to have been an unlawful enterprise, in which suit CL will be seeking compensatory as well as punitive damages.

> If you desire to limit CRN's and your exposure to further and ongoing damage claims, we urge that you immediately remove all references from your web-site and other material to the complaint and charges which you filed with the FTC, as well as any other disparaging references to CL.

10

23.   On or about March 17, 2005, Defendants issued a press release on a public newswire (the "CRN March 17 Release") and at about the same time posted the statements on its website regarding the fact that the FTC was not going to act, stating:

> For its part, Annette Dickinson, Ph.D., president of CRN (www.crnusa.org), said, "CRN is disappointed that CRN thus far has failed to take action on our complaint. We stand by the facts set forth in our complaint, and we remain convinced that CRN should look closely at the business activities of ConsumerLab.com."

24.   Defendants did not remove the CRN Complaint and the CRN March 17 Release from CRN's website until March 31, 2005.

25.   As a direct result of Defendants' unlawful actions, Plaintiff has lost both existing and future subscribers, lost business from both present and future customers, lost both existing and future advertising, publicity and media coverage, lost business opportunities, suffered damage to its alliances and relationships, which losses and damages are continuing.

## AS AND FOR A FIRST CAUSE OF ACTION
### ALLEGING DEFAMATION

26.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "25", as if more fully set forth at length hereat.

27.   Defendants made and published statements that were defamatory to Plaintiff, and such defamatory statements are identified specifically above as the defamatory statements and were published by the Defendants within documents cited as Exhibits "A" through "C", copies of which are attached hereto.

28.   Defendants' defamatory statements are factually false.

11

29.    Defendants published their defamatory statements with actual malice.

30.    Defendants published their defamatory statements in a grossly irresponsible manner.

31.    Defendants published their defamatory statements without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

32.    Damage to the Plaintiff may be presumed from the *per se* nature of the Defendants' defamatory statements.

33.    Defendants' defamatory statements have caused Plaintiff actual damage to its business and reputation.

34.    Defendants' defamatory statements have caused Plaintiff actual damage from lost business and lost profits.

## AS AND FOR A SECOND CAUSE OF ACTION
## ALLEGING INJURIOUS FALSEHOODS

35.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "25", as if more fully set forth at length hereat.

36.    Defendants made and published false statements that were injurious to Plaintiff, and such injurious falsehoods are identified specifically above as the defamatory statements and were published by the Defendants.

37.    Defendants' injurious falsehoods are factually false.

38.    Defendants published their injurious falsehoods with malice.

39.    Defendants published their injurious falsehoods in a grossly irresponsible manner.

40.   Defendants published their injurious falsehoods without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.

41.   Defendants published their injurious falsehoods with the intent of misleading others into action detrimental to Plaintiff.

42.   Defendants' injurious falsehoods have caused Plaintiff actual damage to its business income and business reputation.

43.   Defendants' defamatory statements have caused Plaintiff actual damage from lost business and lost profits.

## AS AND FOR A THIRD CAUSE OF ACTION
## ALLEGING TRADE LIBEL

44.   Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "25", as if more fully set forth at length hereat.

45.   Defendants' defamatory statements disparage Plaintiff's business and services.

46.   Defendants' defamatory statements were false.

47.   Defendants' defamatory statements were published to third parties.

48.   Defendants' publications of their defamatory statements were made with malice.

49.   Defendants' publications of their defamatory statements were made with actual malice.

50.   Plaintiff has suffered lost past and future profits as a direct result of Defendants' defamatory statements.

13

## AS AND FOR A FOURTH CAUSE OF ACTION
### ALLEGING INFLICTION OF INTENTIONAL HARM

51.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "25", as if more fully set forth at length hereat.

52.    Defendants published statements of and regarding Plaintiff with the intent of causing harm to Plaintiff.

53.    Defendants published statements of and regarding Plaintiff without justification or excuse.

54.    Defendants' published statements caused actual harm to the Plaintiff.

## AS A FOR A FIFTH CAUSE OF ACTION
### ALLEGING UNFAIR TRADE PRACTICES

55.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "25", as if more fully set forth at length hereat.

56.    Defendants improperly filed a false and defamatory CRN Complaint and press release of and concerning Plaintiff with the intent of injuring Plaintiff while benefiting and advancing the business of one or more of the members of Defendant CRN.

57.    Defendants improperly filed a false and defamatory CRN Complaint and press release of and concerning Plaintiff with the intent of injuring Plaintiff while promoting and advertising the competing products and services of certain members of Defendant CRN, such members being identified by name in the defamatory CRN Complaint and the press release.

58.    Defendants unfair trade practices caused Plaintiff actual damages.

59.    The unlawful and bad faith conduct of Defendants constitutes unfair trade practices for which Defendants are liable to Plaintiff for damages.

## AS AND FOR A SIXTH CAUSE OF ACTION
## ALLEGING UNFAIR COMPETITION

60.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "25", as if more fully set forth at length hereat.

61.     The unlawful and bad faith conduct of Defendants constitutes unfair competition for which Defendants are liable to Plaintiff for damages under the statutory and common law of the State of New York.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## ALLEGING TORTIOUS INTERFERENCE WITH
## EXISTING CONTRACTUAL RELATIONSHIPS

62.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "25", as if more fully set forth at length hereat.

63.     Plaintiff has contractual relationships with subscribers and contracting clients, and such contractual relationships were known to Defendants at the time of Defendants' tortious interference with those relationships.

64.     Defendants acted with bad faith and engaged in acts of intentional interference with the Plaintiff's contractual relationships with Plaintiff's subscribers and contracting customers.

65.     Defendants' acts of interference constitute tortious interference with the existing contractual relations between Plaintiff and its subscribers and contracting clients.

66.     Defendants' acts of interference have caused actual damage to Plaintiff in the loss of the economic benefit of certain subscriptions and contracts.

*AS AND FOR AN EIGHTH CAUSE OF ACTION*
*ALLEGING TORTIOUS INTERFERENCE WITH*
*PROSPECTIVE CONTRACTUAL RELATIONSHIPS*

67.    Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "25", as if more fully set forth at length hereat.

68.    Plaintiff's business involves obtaining new contractual relationships with subscribers and contracting clients, and such contractual relationships were known to Defendants at the time of Defendants' tortious interference with those prospective relationships.

69.    Defendants acted with bad faith and engaged in acts of intentional interference with the Plaintiff's prospective contractual relationships with Plaintiff's subscribers and contracting customers.

70.    Defendant's acts of interference constitute tortious interference with the prospective contractual relations between Plaintiff and its subscribers and contracting customers.

71.    Defendants' acts of interference have caused actual damage to Plaintiff in the loss of the future economic benefit of prospective subscriptions, contracts and business.

*WHEREFORE*, Plaintiff respectfully requests this Court to grant judgment against Defendants, jointly and severally, as follows:

(a)    Actual damages to the Plaintiff's business reputation in the amount of $2,500,000.

(b)    General damages for defamation per se in the amount of $1,000,000.

16

(c)    Compensatory damages for the Plaintiff's lost profits in the amount of $1,000,000.

(d)    Compensatory damages for the Plaintiff's lost future profits in the amount of $2,000,000

(e)    Punitive damages in the amount of $5,000,000.

(f)    Costs, fees, and expenses incurred by Plaintiff in bringing this action.

(g)    Temporary and permanent injunctions against the Defendants from posting on web sites or otherwise publishing or disseminating the defamatory statements.

(h)    Any and all such further and different relief as this Court deems just and reasonable.

Dated: Manhasset, New York
        April 5, 2005

                        Yours, etc.

                        COOPERMAN LESTER MILLER, LLP

                        By: _____
                            Robert N. Cooperman (RN6352)
                            Attorneys for Plaintiff
                            1129 Northern Boulevard, Suite 402
                            Manhasset, New York 11030
                            (516) 365-1400

TO:    COUNCIL FOR RESPONSIBLE NUTRITION
       1828 L. St. N.W., Suite 900
       Washington, DC 20036-5114

       ANNETTE DICKINSON, President
       Council for Responsible Nutrition
       1828 L. St. N.W., Suite 900
       Washington, DC 20036-5114

## *VERIFICATION*

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF WESTCHESTER    )


TOD COOPERMAN, being duly sworn, deposes and says that deponent is the President of ConsumerLab.com, LLC, the limited liability company named in the within action; that deponent has read the foregoing Verified Complaint and knows the contents thereof; and that the same are true to deponent's own knowledge, except as to the matters therein stated to be alleged upon information and belief, and as to those matters deponent believes them to be true.

This verification is made by deponent because ConsumerLab.com, LLC is a limited liability company. Deponent is an officer thereof, to wit, its President.


_____
TOD COOPERMAN

Sworn to before me this
4th day of April, 2005


_____
Notary Public

ROBERT N. COOPERMAN
Notary Public, State of New York
No. 0756965
Qualified in Nassau County
Commission Expires February 28, 2006

18

**Council for Responsible Nutrition**

1828 L Street, NW, Suite 900 • Washington, DC 20036-5114
(202) 776-7929 • fax (202) 204-7980 • www.crnusa.org

January 12, 2005

Honorable Deborah Platt Majoras
Chairman
Federal Trade Commission
600 Pennsylvania Ave NW
Washington DC 20580

Re:    **Enforcement Action against ConsumerLab.com**

Dear Chairman Majoras:

The Council for Responsible Nutrition hereby requests an investigation of, and enforcement against, ConsumerLab.com (ConsumerLab). ConsumerLab claims to provide independent evaluations of the potency of the nutrients or other dietary ingredients contained in dietary supplement products. ConsumerLab's promotional activities are unfair and deceptive under section 5 of the Federal Trade Commission Act (FTC Act).[1]

ConsumerLab has misled the media and the public into believing that it is providing the complete results of reliable testing for the benefit of all consumers.[2] Nothing could be further from the truth. In fact, ConsumerLab is a for-profit enterprise pressuring manufacturers into using its services for its own financial gain.

---

[1]    15 U.S.C. § 45(a)(1).

[2]    The company's website quotes Tufts University Health and Nutrition Letter saying, "ConsumerLab.com acts as a watchdog over the supplement industry." http://www.consumerlab.com/book/index.asp (last visited December 3, 2004).

The Council for Responsible Nutrition is a leading trade association of the dietary supplement industry, representing manufacturers of finished products available through mass market outlets, natural food stores, and direct sales. Many of CRN's member companies market their products internationally as well as nationally. CRN also represents many major suppliers of dietary supplement ingredients. Attached to this document are a list of CRN's Board of Directors and a list of our member companies.

## EXAMPLES OF CONSUMERLAB DECEPTIVE PRACTICES

Two of ConsumerLab's practices raise particular concerns. First, ConsumerLab hides from the public the material fact that ConsumerLab requires supplement manufacturers to pay a fee to obtain favorable publicity for positive test results or to avoid unfavorable publicity for negative test results. Second, ConsumerLab deceives the public by falsely implying that it operates a laboratory.

ConsumerLab claims to test dietary supplements independently and in the public interest. In fact, this is how the company's program really works:[3]

- ConsumerLab approaches manufacturers and marketers of dietary supplements and offers them the "opportunity" to pay to be included in testing of a particular product or product category. One incentive for participating is that ConsumerLab only publicizes **adverse** test results from manufacturers that refuse to pay.[4] If a

---

[3]    A copy of a typical ConsumerLab contract, retyped by CRN from the original to protect the identity of the company, is attached to this letter.

[4]    Under the ConsumerLab "Voluntary Certification Program," ConsumerLab selects a class of products to test. ConsumerLab then asks manufacturers of dietary supplements within that class to pay to "voluntarily submit" their products for testing. In fact, ConsumerLab already may have determined to test the manufacturer's product, and in any event may do so regardless of the manufacturer's payment of the fee. If a

dietary supplement fails to meet ConsumerLab's criteria and the company has paid to be in the program, then the negative results will not be publicized – that is, will not be included in press releases, in the public section of the ConsumerLab website to which the media and the general public have access, or even in the private section of the ConsumerLab website to which subscribers have access.[5]

- Another incentive for companies to pay to participate in the program is that ConsumerLab only publicizes **positive** test results if a manufacturer accedes to ConsumerLab's demands for money.[6]  Positive results for non-paying manufacturers are not listed on the public portion of the ConsumerLab website to which the general public has free access.

- Despite its name and promotional materials, ConsumerLab has no testing laboratory.[7]  All dietary supplements are tested by unidentified laboratories under contract with ConsumerLab.

---

company initially declines but later decides to participate, an increased fee is charged for inclusion in the "Ad Hoc Testing Program" when the testing for the Product Review has been conducted or is underway.  If a product fails and the company has paid to participate, then ConsumerLab agrees not to reveal the name of the failing product or the participating company (see paragraph 3 of typical contract, attached).

[5]     Private subscribers pay $24 per year for access to the subscriber section of the ConsumerLab website.

[6]     If a manufacturer has paid ConsumerLab the requested fee, ConsumerLab will include positive results for the manufacturer's products on the public section of the ConsumerLab website.  Other passing products will not be mentioned on the public site for the sole reason that the manufacturer has refused to pay ConsumerLab.  Non-paying products will be listed only in the private section of the website, available only to paid subscribers and to media for whom ConsumerLab may choose to provide a password.

[7]     In fact, no ConsumerLab materials provide a business office location or street address for the company.  The only address provided by the company is the address of a UPS Store in White Plains, New York, in which the company has a drop box.

- The testing methodology used by the contract laboratories is not revealed in advance except to companies that pay for testing.

The result is that companies are pressured by ConsumerLab into paying a fee. Despite its name and its claims of independence, ConsumerLab is highly dependent on payments from industry. ConsumerLab hides what it is paid to hide and publicizes what it is paid to publicize.

Manufacturers who refuse to give in to ConsumerLab's scheme will suffer even if their test results are positive, because competing manufacturers who pay the fee will have their positive test results publicized on the free section of the website. Those who do not give in will receive no publicity and will suffer from the fact that their products are omitted from the list of passing products, even if they passed the tests. Their products will be listed only in the section of the website to which the general public has no free access.

## VIOLATIONS OF THE FTC ACT

ConsumerLab's deceptive acts violate the FTC Act in two primary ways. First, ConsumerLab misleads the public by failing to provide material information and by advertising itself as independent of the product manufacturers. Instead of truthfully informing the public that it quashes negative test results for manufacturers who give in to ConsumerLab's demand for payment, ConsumerLab falsely and fraudulently invites consumers to subscribe to the website in order to "find out which products failed our

tests!"[8] Nor does ConsumerLab forthrightly tell consumers and the public that it only

publicizes positive test results for those manufacturers who pay for that publicity.

Instead, ConsumerLab states in each press release that the company "is a leading provider

of consumer information and independent evaluations of products," and that it "has no

ownership from, or interest in, companies that manufacture, distribute, or sell consumer

products."[9]

ConsumerLab's omission of material information and its claims of independence

are likely to mislead consumers into believing that ConsumerLab is operating in the

public interest and cannot be influenced by any outside party. In fact, ConsumerLab is

operating in its own corporate interest and obtains substantial funding from industry.

Second, ConsumerLab deceives consumers into believing that ConsumerLab

itself conducts product testing. Although the detailed description of the testing program

mentions that contract labs are used, the language that appears prominently in press

---

[8]     Product Review: Vitamin E Supplements and Skin Care Products (initial posting
August 25, 2004) *at* http://www.consumerlab.com/results/vitamine.asp. (last visited
December 29, 2004).

[9]     *E.g.*, Press Release, ConsumerLab.com Finds Omega-3 Fish Oil Supplements
Safer Than Fish But Quality Varies Among Brands (December 14, 2004) *at*
http://www.consumerlab.com/news/news_021404.asp. These strong assertions of
independence appear in the press releases and product reviews. Only on the section of
the website describing the company does ConsumerLab disclose that "[t]here is a testing
fee paid by the manufacturer and results are proprietary to the manufacturer." On that
same section of the website, the company asserts that "it is not affiliated with
manufacturers of health and nutrition products" and that revenues are derived from sales
of subscriptions, books, reports, and advertisements as well as from "Voluntary
Certification Program fees, and license fees from both the re-publication of its proprietary
information and the authorized use of the CL Seal of Approval." About
ConsumerLab.com *at* http://www.consumerlab.com/aboutcl.asp (last visited December
28, 2004).

releases and elsewhere on the website strongly suggests that the company "tests" the products.[10]

The name "ConsumerLab" itself deceptively suggests that the company operates a laboratory. As the FTC and the courts have recognized, a trade name can be deceptive if it states or implies that a product contains something that is absent from the product. Just as the FTC ruled that the trade name "Micro Silk" could not be used on blouses that do not contain silk, the name "ConsumerLab" is unacceptable for a company that does not operate a lab.[11] Indeed, the ConsumerLab name is so deceptive that excision may be warranted.[12]

ConsumerLab's unfair and deceptive actions cause substantial injury to consumers as well as manufacturers. The deception directly affects consumers in their decision to purchase a subscription to the ConsumerLab website or to purchase a book with the ConsumerLab name, as well as their choice of which dietary supplements to purchase. ConsumerLab's unscrupulous practices are particularly harmful both to

---

[10]    Its statements to this effect include: "ConsumerLab.com, as part of its mission to independently evaluate products that affect health, wellness, and nutrition, purchased many of the leading vitamin E products sold in the U.S. *and tested them* for their quality." (August 25, 2004), Product Review: Vitamin E Supplements and Skin Care Products, *supra;* "ConsumerLab.com announced the findings today of *its most recent testing* of St. John's wort supplements." (April 27, 2004) *at* http://www.consumerlab.com /news/news_042704.asp; "ConsumerLab.com *tested* 15 iron products." (July 26, 2004) *at* http://www.consumerlab.com/results/iron.asp. Emphasis added.

[11]    In the Matter of Notations, Inc., *et al.*, 119 F.T.C. 71 (January 18, 1995).

[12]    The natural and literal meaning of the name ConsumerLab is not ambiguous. FTC consistently has held that "[w]hile excision should not be ordered if a less drastic remedy will accomplish the same result, it cannot be avoided where 'a clear and unambiguous false representation [is] implicit in the product's name, and, because of this, the addition of a qualifying phrase denying the truth of that representation would lead to a confusing contradiction in terms.'" In the Matter of Devcon Corp., *et al.*, 73 F.T.C. 272 (February 6, 1968) *quoting* Continental Wax Corp. v. F.T.C., 330 F.2d 475, 479-80 (2d Cir. 1964). *E.g.*, In the Matter of Brake Guard Products, Inc., *et al.*, 125 F.T.C. 139 (January 15, 1998).

consumers and to manufacturers because of mounting public interest in the quality of dietary supplements and because of the media attention commanded by ConsumerLab.

This entire business model represents an egregious form of consumer fraud and deception. We therefore request that the FTC investigate ConsumerLab and its method of business operations thoroughly and bring appropriate enforcement action to assure that these deceptive activities do not continue. Specifically, we request that ConsumerLab be required to do all of the following:

- Make public all future test results, regardless of whether companies have or have not paid money to ConsumerLab.

- Make public the specific testing criteria and methodologies to be used, prior to undertaking the testing, so that manufacturers can release their own test results at the same time and thus provide consumers with comparative data.

- Make public the identity of the analytical laboratories conducting the ConsumerLab testing.

- Change the ConsumerLab name, to correct the impression created in consumers' minds that ConsumerLab operates a laboratory.

The Council for Responsible Nutrition and its member companies fully recognize the value and importance of legitimate third-party testing and verification programs that help consumers select high quality products and that operate in an honest and above-board manner. Two examples of such programs include those currently operated by the U.S. Pharmacopeia and by NSF International. The ConsumerLab business model, by contrast, is unfair and deceptive. Unless the FTC imposes the requirements outlined

above, ConsumerLab will continue to operate in a fraudulent and deceptive manner. We urge prompt investigation and swift enforcement to curtail ConsumerLab's unfair business practices.

Sincerely,

*A D ickinson*

Annette Dickinson, Ph.D.

President, Council for Responsible Nutrition

cc:    Commissioner Orson Swindle

Commissioner Thomas B. Leary

Commissioner Pamela Jones Harbour

Commissioner Jon Leibowitz

The Science Behind the Supplements

## Officers

**Chuck Brice** Chair
**Mike Doyle** Chair-Elect
**Marjorie Fine** Treasurer
**Mark LeDoux** Secretary
**Annette Dickinson** President

## Executive Committee

**Chuck Brice** Chair
**Mike Doyle** Chair-Elect
**Marjorie Fine** Treasurer
**Mark LeDoux** Secretary
**Byron Johnson** Immediate Past Chair
**Edwin Kamauoha** Manufacturers' Representative
**Joseph LaPlaca** Suppliers' Representative
**David Christensen** Member at Large
**John Venardos** Member at Large
**Tom Zimmerman** Member at Large
**Bill Van Dyke** Membership Chair
**Annette Dickinson** President

## Board Members

Manufacturers
Michael Bradley        **Perrigo Company**
Joseph Bresse          **General Nutrition Centers, Inc.**
Samuel Caster          **Mannatech, Inc**
David Christensen      **Bayer Corporation**
Andrew Davis           **Wyeth Consumer Health**
Patrick Dunn           **Leiner Health Products Inc.**
Tom Elitharp           **Weider Nutrition International, Inc.**
Marjorie Fine          **Shaklee Corporation**
Richard Godfrey        **Swiss Caps USA, Inc.**
Jeffrey A. Hinrichs    **Nutraceutical Corporation**
Byron Johnson          **Access Business Group/Nutrilite**
Edwin Kamauoha         **Pharmanex**
Harvey Kamil           **NBTY, Inc.**
Mark LeDoux            **Natural Alternatives International, Inc.**
John Venardos          **Herbalife International of America, Inc.**
Tom Zimmerman          **Pharmavite LLC**

Suppliers
Chuck Brice            **Kemin Health, L.C.**
Edward Croom           **Indena USA, Inc.**
Mike Doyle             **BASF Corporation**
David Eckert           **Cognis Nutrition & Health**
Larry Esposito         **Rhodia Inc.**
Steven Furcich         **Archer Daniels Midland Company**
Joseph LaPlaca         **DSM Nutritional Products, Inc.**
Bill Van Dyke          **B&D Nutritional Ingredients, Inc.**
Ted Ziemann            **Cargill Health & Food Technologies**

## Voting Members

Access Business Group/Nutrilite
Ada, MI

Accucaps Industries Limited
CANADA

Albion Laboratories, Inc.
Clearfield, UT

American Laboratories, Inc.
Omaha, NE

Amerilab Technologies, Inc.
New Hope, MN

Archer Daniels Midland Company
Decatur, IL

B&C Nutritional Products, Inc.
Vista, CA

B&D Nutritional Ingredients, Inc.
Carlsbad, CA

BASF Corporation
Mount Olive, NJ

Bayer Corporation
Morristown, NJ

Bio San Laboratories Inc.
Derry, NH

Biotron Laboratories, Inc.
Centerville, UT

Cadbury Adams USA LLC
Morris Plains, NJ

Capsugel
Greenwood, SC

Cardinal Nutrition
Vancouver, WA

Cargill Health & Food Technologies
Minneapolis, MN

Cognis Nutrition & Health
LaGrange, IL

Colorcon
West Point, PA

DSM Nutritional Products
Parsippany, NJ

Daiichi Fine Chemicals, Inc.
Lincolnshire, IL

Eastman Chemical Company
Kingsport, TN

E.T. Horn Company
La Mirada, CA

General Nutrition Centers, Inc.
Pittsburgh, PA

GNLD International
Fremont, CA

Generichem Corporation
Totowa, NJ

Herbalife International of America, Inc.
Century City, CA

Indena USA, Inc.
Seattle, WA

Kaneka America Corporation
New York, NY

Kemin Health, L.C.
Des Moines, IA

Leiner Health Products, Inc.
Carson, CA

Linnea, Inc.
Easton, PA

Lonza, Inc.
Fair Lawn, NJ

Mannatech, Inc.
Coppell, TX

Mingtai Chemical, LLC
Mountainside, NJ

NBTY, Inc.
Bohemia, NY

Natural Alternatives International Inc.
San Marcos, CA

Nurture, Inc.
Devon, PA

Nutraceutical Corporation
Park City, UT

Nutramax Laboratories, Inc.
Edgewood, MD

Nutrinova
Frankfurt, GERMANY

Nutrition 21
Purchase, NY

Omya, Inc.
Lucerne Valley, CA

Perrigo Company
Allegan, MI

Pharmanex LLC
Provo, UT

Pharmavite LLC
Mission Hills, CA

Polyphenolics
Granger, IN

Pronova Biocare, a.s.
NORWAY

Proper Nutrition, Inc.
Reading, PA

Rainbow Light Nutritional Systems
Santa Cruz, CA

Reliv International, Inc.
Chesterfield, MO

Rhodia, Inc.
Cranbury, NJ

Ross Products
Columbus, OH

Shaklee Corporation
San Francisco, CA

Shionogi Qualicaps, Inc.
Whitsett, NC

Stauber Performance Ingredients
Fullerton, CA

Swiss Caps USA, Inc.
Miami, FL

Unigen Pharmaceuticals, Inc.
Broomfield, CO

VitaTech International, Inc.
Tustin, CA

Weider Nutrition International, Inc.
Salt Lake City, UT

Wyeth Consumer Health
Madison, NJ

Zila Nutraceuticals
Prescott, AZ

**Associate Members**

Covance Laboratories, Inc.
Madison, WI

Gail Becker Associates of Florida, Inc.
Sarasota, FL

Merical Vita-Pak, Inc.
Anaheim, CA

Monsanto Life Sciences Company
Chicago, IL

NSF International
Ann Arbor, MI

Nutrition Business Journal
San Diego, CA

PROSAR International Poison Center
St. Paul, MN

SafetyCall International
Minnetonka, MN

SETCO, Inc.
Anaheim, CA

U.S. Pharmacopeia
Rockville, MD

Virgo Publishing Inc.
Phoenix, AZ

**International/Correspondent Members**

Bioriginal Food & Science Corporation
CANADA

Enzo Nutraceuticals
NEW ZEALAND

Gumlink A/S
DENMARK

Jamieson Laboratories Ltd.
CANADA

Ocean Nutrition Canada Ltd.
CANADA

Seven Seas Limited
ENGLAND

Copy of Agreement Received from CRN Member Company
(Obtained June 200. .nd re-typed by CRN to protect the identity of the member company)

## TESTING AGREEMENT

Agreement by and between ConsumerLab.com, LLC (hereinafter referred to as "CL") having its principal place of business at 333 Mamaroneck Avenue, White Plains, NY 10605 and Requestor described below:

Requestor (Company Name):

Address of Principal Place of Business of Requestor:

Billing Address (if Different):

Requestor Representative (and Address if Different from Above):

Requestor Representative Contact Information:

As used in this Agreement, the following terms have the meanings set forth below:

**Product Category:** Multivitamin/Multimineral Dietary supplements

**Specific Product(s):**

**Testing:**
1. Products analyzed for their vitamin and mineral index elements (see below) using the USP (United States Pharmcopeia) 25 methods for Oil- and Water-soluble Vitamins and Mineral Tablets.
2. Analysis for lead performed using an ICP-MS (Inductively Coupled Plasma-Mass Spectroscopy) or atomic absorption/graphite furnace method.
3. Disintegration of non-chewable and non-time release formulations utilizing USP (United States Pharmacopeia) <2040> vitamin methods.

**Pass: (The following constitutes a "Pass" in the Testing)**
1. Contain at least 100% and no more than 150% of its claimed amount of the index elements (as described below). Any product claiming vitamin A must meet its claimed amount for total vitamin A (beta-carotene and retinol combined) as well as meet any claimed ratio of beta-carotene to total vitamin A.

   Product will be tested for at least one index element in each category shown below. The first element within each category will be selected unless not claimed in the product in which case the next claimed element will be selected.

   - Oil-soluble vitamins
     - o Vitamin A (levels of beta carotene and retinal (rotinyl acetate or palmitate evaluated independently)
     - o Vitamin E (natural and synthetic forms)
     - o Vitamin D

Copy of Agreement Received from CRN Member Company
(Obtained June 20. and re-typed by CRN to protect the identity of the member company)

- Water-soluble vitamins
  - o  Folic acid (folate)
  - o  Vitamin C (ascorbic acid)
  - o  B Vitamins – Niacin or Pyridoxine or Riboflavin
- Minerals
  - o  Calcium
  - o  Iron
  - o  Zinc
  - o  Magnesium

2.  Must not exceed CA Prop 65 levels for lead contamination in a recommended daily serving and, in no event, exceed 3 mcg of lead in a recommended daily serving. If a maximum recommended daily serving is not defined, a daily serving size will be determined and applied by CL.

3.  If applicable to Product, Product must meet disintegration requirements as set by USP.

4.  The level of any ingredient in the Product must not pose a significant health risk when used as recommended on an acute or chronic basis. Additionally, if Product exceeds the most recent UL (Tolerable Upper Intake Level established by the Institute of Medicine of the National Academies) for any ingredient claimed or contained, CL may indicate this fact in its listing(s) of the Product. This will be determined based on the Product's suggested daily unit dose for routine use multiplied by the greater of (i) the claimed amount of the ingredient per unit or (ii) the amount of ingredient per unit as measured in Testing.

5.  Product must meet all FDA labeling requirements.

**Results:** A summary of analytical findings from the Testing.

**Delivery Date:** Approximately ten weeks to twelve weeks from date of signing.

**Testing Fee:** $3,750 per Product. If testing is requested for 3 or more Products under this Agreement, the Testing Fee is reduced $500 per Product. Testing Fee shall be increased for testing of additional ingredients requested by Requestor and indicated in an appendix to this Agreement. Fee is due upon signing.

1.  Subject to and on the conditions of this Agreement, CL shall perform Testing of a sample of the Requestor's Product(s). The sample shall consist of a sufficient amount of product from a single lot of the Product purchased by CL at the consumer retail level (stores, mail order, online, etc.). Requestor shall pay to CL an amount equal to the Testing Fee plus any applicable sales tax multiplied by the number of Products to be Tested prior to initiation of Testing. Results shall be delivered by CL to Requestor by the Delivery Date.

Copy of Agreement Received from CRN Member Company
(Obtained June 200_ and re-typed by CRN to protect the identity of the member company)

2.    If a Product Passes the Testing:

    a.  Requestor hereby grants to CL the perpetual right to publish all or some of the Results, including the name of the Requestor and the name of the Product, subject to Requestor's requirements as to the proper use of its trademarks, indicating that the Product Passed the Testing.

    b.  Requestor has the right to issue a single press release, which can include Results of the Product's Passing status. The release is to include the following information:

        i.  Testing of Products by CL indicated that Product met the CL quality standard for Product Category.

        ii.  Product sample was purchased by CL on the open market and tested in an independent laboratory blinded to the Product's identity.

        iii.  For more information go to www.consumerlab.com. Requestor must submit to CL, at least seven (7) business days prior to use, the press release for CL's approval. CL shall, within seven (7) business days of the receipt, provide Requestor with its approval or required changes for such materials. A copy of the final version is to be sent to CL for its records. The press release must be issued within 60 days of the CL's posting the Results on its Web site.

    c.  Requestor shall also be eligible to enter into a CL Seal Use License to use the Results and CL Seal in the promotion and marketing of the Passing Product. Such License requires the payment of an additional licensing fee and must be used according to specified terms. Should Requestor enter into the CL Seal Use License for the Product, the Testing Fee paid for the Product will be deducted from the initial License fee subject to the condition of this Agreement.

    d.  The above notwithstanding, should a Product that Passes Testing have the same name (i.e. brand name, product name, and other labeled descriptions such as manufacturer, distributor, strength and flavor) as a product that at any time is considered by CL as not having Passed the Testing, CL may require that any mention of the Product relating to its Passing status must include notation enabling a consumer to easily and accurately distinguish the Product from the earlier Product.

    e.  CL may require that any mention of the Product relating to its Passing status include notation of potential risks and suggested limitations associated with its use.

Copy of Agreement Received from CRN Member Company
(Obtained June 2[ ] and re-typed by CRN to protect the identity of [ ] member company)

3.  If a product does not Pass the Testing, Requestor hereby grants to CL the perpetual right to publish all or some of the Results without indicating the name of the Requestor or the name of the Product.

4.  CL is authorized to permit others to use and publish the information described in paragraph 2 and 3.

5.  Notwithstanding the above, CL reserves the right to disqualify Product at any time from Passing the Testing, remove Product from any of its published information and derivative of such information, and revoke the eligibility of Requester to enter in a CL Seal Use License for the Product if it considers Product to present a safety risk or to provide misleading or inaccurate information on its labeling.

6.  The Results, including the compilation of the information contained therein and the description of the Testing methodology employed, are and shall remain the sole property of CL. Requestor will take no action to infringe on the rights of the CL therein and shall not use the results in any fashion other than for Requestor's own internal analysis unless otherwise agreed to in writing by CL.

7.  Miscellaneous:

    a.  Requestor is responsible for payment of any applicable sales or use taxes.

    b.  If Requestor breaches any of its material obligations under this Agreement, CL may summarily terminate any and all of the Requestor's rights hereunder and, in addition, Requester shall remain liable to CL for any and all damages sustained by CL.

    c.  Any and all disputes or controversies arising out of or relating to this Agreement shall be resolved by arbitration in accordance with the rules and regulations of the American Arbitration Association in New York City.

    d.  CL is not responsible for delays or errors beyond its control, including those related to sample procurement or laboratory performance.

    e.  This Agreement is binding upon and shall inure to the benefit of CL and Requestor and their respective successors and assigns.

This Agreement shall take effect upon acceptance in writing below by an authorized agent of CL.

Having read the above and by signing below, CL and the Requestor each herby agree to be bound by this Agreement. Each of the signatories represents that he or she is duly authorized to sign this Agreement on behalf of the respective party.

Council for Responsible Nutrition

Home | Who Is CRN? | About Dietary Supplements | Industry Regulation | Press Room | Annual Conference | Members Only

**Press Room**

Contact: **Judy Blatman**
direct **(202) 204-7962**

· Download PDF for printing

# FTC Urged to Investigate Purported Consumer Watchdog
## — Trade Association Petitions Agency to Stop ConsumerLab.com's Deceptive Business Practices —

*WASHINGTON, D.C., January 13, 2005* — The Council for Responsible Nutrition (CRN) has asked the Federal Trade Commission (FTC) to investigate deceptive business practices by ConsumerLab.com and take appropriate action.

The CRN complaint states that ConsumerLab.com—which represents itself as a consumer watchdog testing dietary supplements—is in reality a for-profit company that solicits money from the makers of products it plans to have tested. Those that pay have positive results highlighted and negative results quashed; those that don't pay have negative results highlighted and positive results obscured.

"Until now, nobody has looked behind the curtain and exposed ConsumerLab.com's tactics," said CRN President Annette Dickinson, Ph.D. "It is a business, not a watchdog—one that intimidates manufacturers to pay for its services. We ask the FTC to lift the veil this company uses to disguise its true nature."

ConsumerLab.com promotes itself as "a leading provider of consumer information and independent evaluations of products that affect health and nutrition." Contrary to the image it projects of an actual testing facility, ConsumerLab.com essentially is a three-person operation, and its business address is a UPS drop box in White Plains, N.Y. It farms out product testing, but does not make public the identity of the laboratories it uses.

Here is how it works: ConsumerLab.com approaches dietary supplement makers requesting that they enroll in its "voluntary" testing program—for a fee. Those that pay are guaranteed that products failing the subsequent testing will not be identified publicly. Companies that do not pay risk having their products tested anyway and, if they fail, being publicized on ConsumerLab.com's Web site and in the media.

Meeting ConsumerLab.com's standards is no guarantee that a manufacturer will be treated fairly. Only products from companies that pay up and pass are mentioned on the free portion of ConsumerLab.com's Web site. Products that pass but are made by companies that don't pay are listed only on the private portion of the site. These products are absent from the public site, giving the impression to non-subscribers that they must have failed because they aren't listed. And even the 20,000 Web subscribers, who pay $24 a year for "full access" to product tests, aren't told that ConsumerLab.com has agreed to suppress failing results for companies that paid up.

CRN and its member companies recognize the value and importance of legitimate third-party testing programs—such as those run by U.S. Pharmacopeia and NSF International—that operate in an honest and aboveboard manner and help consumers select high-quality products. The ConsumerLab.com business model, by contrast, is unfair and deceptive.

CRN is asking the FTC to make ConsumerLab.com: 1) make public all future test results regardless of whether companies have paid money to ConsumerLab.com; 2) release testing criteria and methodologies in advance; 3) identify the contract laboratories that actually do its testing; and 4) change its name to one that does not falsely imply that it does its own testing.

"ConsumerLab.com's entire business model is based upon threat and deception," Dr.

CRN consistently does all it can to clean up the industry its ability to mislead the media and the public.

Founded in 1973, CRN is a Washington, D.C.-based trade association representing dietary supplement industry ingredient suppliers and manufacturers. CRN members adhere to a strong code of ethics, comply with dosage limits and manufacture dietary supplements to high quality standards under good manufacturing practices. For more information on CRN, visit www.crnusa.org.

_____

**Note to Editor:** To read a copy of CRN's FTC complaint, go to: http://www.crnusa.org/pdfs/CRNFTC_ConsumerLabs011205.pdf or contact Judy Blatman at 202-204-7962 (jblatman@crnusa.org).

1828 L Street, NW, Suite 900 · Washington, DC, 20036-5114 · (202) 776-7929 fax (202) 204-7980 · e-mail webmaster@crnusa.org

**COUNCIL FOR RESPONSIBLE NUTRITION**
1828 L Street, NW, Suite 900 • Washington, DC 20036-5114
(202) 776-7929 • fax (202) 204-7980 • www.crnusa.org

Case 1:06-cv-01390-RMC   Document 13-5   Filed 02/23/2007   Page 41 of 48

January 21, 2005

Tod Cooperman, M.D.
President, ConsumerLab.com, LLC
333 Mamaroneck Avenue
White Plains, NY 10605

Dear Dr. Cooperman:

On January 13, you circulated a letter to your e-mail list expressing dismay and disappointment about the fact that CRN has filed a complaint with the Federal Trade Commission requesting an investigation of your unfair and deceptive business practices. I assure you that we at CRN were also dismayed and disappointed when we recently learned the full details of the business plan underlying ConsumerLab's activities. Providing independent testing of our industry's products is a noble goal. Pressuring companies to pay for testing in order to guarantee that positive results are given prominent attention and that negative results are hidden, while suggesting to consumers that you reveal all results, is far from noble.

Your letter admits to the very business practices about which we are complaining, but in a manner so oblique that only those of us who fully understand the ConsumerLab business plan will comprehend the admission. You say that it is "false and absurd" for us to claim that companies are pressured to pay a fee "to avoid unfavorable publicity for negative test results." Yet you go on to describe exactly such a system, and your description is entirely consistent with our description of your business practices in our FTC complaint.

You assert that ConsumerLab publishes findings "for all the products that we choose to test, whether they pass or fail." (emphasis added) The casual reader might interpret this clever phrasing to mean that ConsumerLab publishes all test results, period -- but in fact this policy of full disclosure applies only to one of ConsumerLab's two parallel testing programs. Full passing and failing results are disclosed only for the random testing program (e.g., the products you "choose to test"). Moreover, test results for these products are available only on the private subscriber ConsumerLab website.

Full disclosure does not apply to ConsumerLab's second testing program, the Voluntary Certification Program, in which companies must pay to participate. As your letter indicates, for this program you "publish the names of products that pass." (emphasis added) In fact, those passing results are the only results that will appear for paying products. As we know from interviewing our member companies and from reading the contracts that have been shared with us, companies that pay the fee are assured that if

they fail the testing, neither the name of the company nor the identity of the failing product will be revealed on the public or private portion of the ConsumerLab website or anywhere else.

To pressure the companies to pay a fee to obtain maximum public exposure for positive results and to quash negative results amounts to a shake-down, which we are asking the FTC to stop. We are not complaining about the existence of the testing program, but about the unfair business model upon which it is based.

The deception of consumers occasioned by this business model lies in leading the public to believe that ConsumerLab is independent of industry, which it is not, and that all test results are revealed, which they are not. As the central focus of our complaint, we are asking the FTC to require that all future test results be revealed in a fair and complete manner, without regard to payment received. This should create a level playing field for the companies and fuller disclosure for consumers -- goals we believe are essential to your expressed mission, as stated in your letter, of "exposing problems in the supplement industry and helping consumers identify better quality products."

Sincerely,

Annette Dickinson, Ph.D.
President

cc: Honorable Deborah Platt Majoras, Chairman, FTC
    Honorable Orson Swindle, Commissioner
    Honorable Thomas B. Leary, Commissioner
    Honorable Pamela Jones Harbour, Commissioner
    Honorable Jon Leibowitz, Commissioner



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Division of Advertising Practices

Mary Koelbel Engle
Associate Director

March 15, 2005

<u>VIA FIRST-CLASS MAIL and EMAIL</u>

Annette Dickinson, Ph.D.
President
Council for Responsible Nutrition
1828 L St. NW, Suite 900
Washington, DC  20036-5114

         *Re:*    ***Council for Responsible Nutrition's Complaint Against
ConsumerLab.com, LLC***

Dear Dr. Dickinson:

      Thank you for your January 12, 2005, letter and subsequent materials regarding
ConsumerLab.com, LLC ("ConsumerLab") and its Product Review and Voluntary Certification
programs for testing dietary supplements and similar consumer products ("Test Programs").
Council for Responsible Nutrition alleges that ConsumerLab's "entire business model represents
an egregious form of consumer fraud and deception," and asserts, among other things, that

          *     "[C]ompanies are pressured . . . into paying a fee" for testing under the
                   Voluntary Certification program to avoid potential negative consequences
                   of having their products tested under the Product Review program; and
                   that

          *     ConsumerLab's Test Programs and its reporting of test results "are likely
                   to mislead consumers into believing that ConsumerLab is operating in the
                   public interest and cannot be influenced by any outside party."

      The Commission has been directed by Congress to act in the interest of all consumers to
prevent deceptive or unfair acts or practices, pursuant to Section 5 of the Federal Trade
Commission Act, 15 U.S.C. § 45.  A representation, omission, or practice is deceptive if (1) it is
likely to mislead consumers acting reasonably under the circumstances; and (2) it is "material,"
that is, likely to affect consumers' conduct or decisions with regard to a product or service.  An
act or practice is unfair if it causes or is likely to cause injury to consumers that (1) is substantial;
(2) is not outweighed by countervailing benefits to consumers or to competition; and (3)  is not

Council for Responsible Nutrition
March 15, 2005
Page 2

reasonably avoidable by consumers themselves.

In determining whether to take enforcement or other action in any particular situation, the Commission may consider a number of factors, including the type of violation alleged, the nature and amount of consumer injury at issue, the number of consumers affected, and the likelihood of preventing future unlawful conduct and securing redress or other relief. After reviewing the complaint and related materials, staff is not recommending agency action at this time. The Commission reserves the right, however, to take such further action as the public interest may require.

Thank you for bringing Council for Responsible Nutrition's concerns regarding ConsumerLab.com, LLC to our attention.

Very truly yours,

Mary K. Engle
Associate Director

cc:    Tod Cooperman, M.D.
       President
       ConsumerLab.com, LLC

# COOPERMAN LESTER MILLER LLP

### *ATTORNEYS-AT-LAW*

1129 NORTHERN BOULEVARD • MANHASSET, N.Y. 11030
(516) 365-1400
FAX: (516) 365-1404

ROBERT N. COOPERMAN
Direct Dial: 516-365-1400, Ext. 102

e-mail address: rcooperman@clmlaw.com

NEW YORK CITY OFFICE
767 THIRD AVENUE
NEW YORK, N.Y. 10022
(212) 688-7000
FAX: (212) 371-7634

March 15, 2005

*VIA FEDERAL EXPRESS and E-MAIL*
*(adickinson@CRNUSA.org)*

Annette Dickinson, Ph.D.
President
Council for Responsible Nutrition
1828 L. St. N.W., Suite 900
Washington, DC 20036-5114

> Re:    *ConsumerLab.com.LLC – Claim Against Council for*
> *Responsible Nutrition, Annette Dickinson, and Others*
> Our File No. 4841.001

Dear Dr. Dickinson:

On or about January 12, 2005 you, on behalf of the Council for Responsible Nutrition ("CRN"), filed a Complaint with the Federal Trade Commission ("FTC") against our client, ConsumerLab.Com ("CL"), labeled "Enforcement Action Against ConsumerLab.Com". At the same time you posted your complaint on your web site and issued a press release electronically linked to your web site.   In your papers to the FTC you state as fact that CL engages in "false and fraudulent" and "unscrupulous" acts and practices, is involved in a "shakedown" and is in violation of the FTC Act.

As you now know, the FTC, by letter to you dated March 15, 2005, has refused to take any enforcement or other action with respect to your complaint even though, as the FTC letter notes, your complaint "alleges that ConsumerLab's 'entire business model represents an egregious form of consumer fraud and deception.' "

While we very much respect the right of concerned citizens to lodge *bona fide* complaints with governmental agencies, we believe that the charges which you filed against CL with the FTC, loaded as they were with inflammatory and defamatory characterizations and so widely disseminated by you, had as their essential purpose, to silence CL and wreak

Annette Dickinson, Ph.D.
Council for Responsible Nutrition
March 15, 2005
Page 2

vengeance upon CL for disclosing the failings of some in your industry and, perhaps, benefit certain of CRN's associate members which are competitors of CL.

We believe that what you have done is both legally and morally wrong. We also believe that a Court will find that your actions, and especially the simultaneous wide dissemination of the charges, were unlawful and defamatory and were maliciously designed to undermine CL and its business.

As a direct result of your actions, CL has lost subscribers, manufacturers have withheld products for testing by CL, and CL's alliances and relationships have been jeopardized, all of which has caused untold damages to CL for which it will be commencing suit against CRN and you, as its executive director, and any others involved in what we believe to have been an unlawful enterprise, in which suit CL will be seeking compensatory as well as punitive damages.

If you desire to limit CRN's and your exposure to further and ongoing damage claims, we urge that you immediately remove all references from your web-site and other material to the complaint and charges which you filed with the FTC, as well as any other disparaging references to CL.

Very truly yours,

*Robert N. Cooperman*

Robert N. Cooperman

RNC/rs