UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNCIL FOR RESPONSIBLE
NUTRITION and
ANNETTE DICKINSON,

        Plaintiffs,

    v.

HARTFORD CASUALTY INSURANCE
COMPANY,

        Defendant.

Case No.: 1:06-CV-01590-RMC

ORAL ARGUMENT REQUESTED

## DEFENDANT HARTFORD CASUALTY INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7 and 56.1, Defendant Hartford Casualty Insurance Company ("Hartford"), through undersigned counsel, hereby moves for summary judgment declaring that Hartford had no duty to defend Plaintiffs Council for Responsible Nutrition and Annette Dickinson ("Plaintiffs") in the lawsuit brought against them in New York state court that is the subject of Plaintiffs' Complaint. The grounds supporting this Motion for Summary Judgment are fully set forth in the accompanying Memorandum of Points and Authorities.

Hartford hereby requests oral argument on its Motion.

In accordance with Local Rule 7, this Motion also is accompanied by a Statement of Material Facts As To Which There Is No Genuine Issue and a Proposed Order. In addition, this Motion is supported by the accompanying Declaration of Patrick F. Hofer.

WHEREFORE, Hartford respectfully requests that this Court grant its motion and enter judgment in favor of Hartford for the reasons outlined in its Memorandum of Points and Authorities.

DATED this 23RD day of February 2007.

Respectfully submitted,

___/s/ Patrick F. Hofer_____
Patrick F. Hofer, Bar No. 412665
Tracy P. Varghese, Bar No. 472805
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 274-2950 (tel.)

*Counsel for Hartford Casualty Insurance Co.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNCIL FOR RESPONSIBLE
NUTRITION and
ANNETTE DICKINSON,

          Plaintiffs,

    v.

HARTFORD CASUALTY INSURANCE
COMPANY,

          Defendant.

Case No.: 1:06-CV-01590-RMC

**DEFENDANT HARTFORD CASUALTY INSURANCE COMPANY'S
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF ITS MOTION FOR SUMMARY JUDGMENT**

TROUTMAN SANDERS LLP
Patrick F. Hofer, Bar No. 412665
Tracy P. Varghese, Bar No. 472805
401 9th Street, NW, Suite 1000
Washington, D.C. 20004-2134
(202) 274-2950

*Counsel for Defendant Hartford
Casualty Insurance Company*

Dated:   February 23, 2007

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   FACTUAL STATEMENT .....................................................................................3

      A.    The Parties .................................................................................................3

      B.    The Underlying Suit....................................................................................4

      C.    The Hartford Policy ....................................................................................7

      D.    The Coverage Dispute.................................................................................9

III.  ARGUMENT..........................................................................................................9

      A.    Summary Judgment Standard ...................................................................10

      B.    The Duty to Defend Is Determined by Comparing the Allegations of the
            Underlying Complaint to the Terms of the Insurance Policy ...................10

      C.    Hartford Did Not Have a Duty to Defend Because the Underlying Complaint
            Alleged that the Plaintiffs Committed an Offense with the Expectation of
            Inflicting Injury........................................................................................12

            1.    Injury That Is the Natural and Probable Consequence of the Insured's
                  Actions Is "Expected"..................................................................13

            2.    The Underlying Complaint Clearly Alleges that the Plaintiffs Expected to
                  Inflict "Personal and Advertising Injury" ...................................17

            3.    The Underlying Complaint Specifically Alleges that the Plaintiffs
                  Intended to Injure ConsumerLab ..................................................19

      D.    The Facts Alleged in the Underlying Complaint Made any Liability for an
            Offense with a Covered State of Mind a Legal Impossibility ..................21

            1.    The Underlying Complaint Necessarily Alleged Intent to Cause Personal
                  Injury to Demonstrate that CRN and Dickinson Were Never Entitled to
                  Assert a Privilege .......................................................................22

                  a.  The *Noerr-Pennington* Doctrine ..........................................22

                  b.  The Absolute Privilege for Statements in Judicial and
                      Quasi-Judicial Proceedings...................................................25

    c. Section 74 of the New York Civil Rights Law .....................................27

  2. ConsumerLab Could Not Successfully Allege Defamation or
    Disparagement Without Also Alleging Intent to Injure.............................29

IV. CONCLUSION..................................................................................................................29

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Bridge C.A.T. Scan Associates v. Murphy*, 608 F. Supp. 1187 (S.D.N.Y. 1985) ...................26, 27

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127
    (1961)..................................................................................................................22, 23

*Freightquote.com, Inc., v. Hartford Casualty Insurance Co.*, 397 F.3d 888
    (10th Cir. 2005)..............................................................................15, 16, 17, 19

*Freightquote.com, Inc., v. Hartford Casualty Insurance Co.*, 316 F. Supp. 2d 937, 942
    (D. Kan. 2003) ...............................................................................16, 17, 19

*Ideal Electric Sec. Co. v. International Fidelity Insurance Co.*, 129 F.3d 143
    (D.C. Cir. 1997) .....................................................................................10, 11

*Nationwide Mutual Insurance Co. v. Richardson*, 270 F.3d 948 (D.C. Cir. 2001) ......................11

*Puritan Ins. Co. v. 1330 Nineteenth Street Corp.*, Nos. 83-2228 and 83-1754, 1984 U.S.
    Dist. LEXIS 18477 (D.D.C. Mar. 19, 1984)................................................13, 14

*Potomac Electric Power Co. v. Cal. Union Insurance Co.*, 777 F. Supp. 968
    (D.D.C. 1991) ...................................................................................................11

*Travelers Indemnity Co. v. Walburn*, 378 F. Supp. 860 (D.D.C. 1974) .................................14, 15

*United Mine Workers v. Pennington*, 381 U.S. 657 (1965).....................................................22, 23

*YWCA v. Allstate Insurance Co.*, 275 F.3d 1145 (D.C. Cir. 2002).................................................10

## STATE CASES

*Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc.*, 268 A.D.2d 101, 707
    N.Y.S.2d 647 (2000).....................................................................................22, 23

*Allan and Allan Arts Ltd. v. Rosenblum*, 201 A.D.2d 136, 615 N.Y.S.2d 410 (1994) .................25

*American Cont'l Insurance Co. v. Pooya*, 666 A.2d 1193 (D.C. 1995) .................................11, 21

*Branca v. Mayesh*, 101 A.D.2d 872, 476 N.Y.S.2d 187 (1984) ..............................................27, 28

*Byrd v. Nationwide Mutual Insurance Co.*, 415 A.2d 807 (D.C. 1980) .......................................13

*Concourse Nursing Home v. Engelstein*, 181 Misc. 2d 85, 692 N.Y.S.2d 888
   (Sup. Ct. New York Co. 1999), *aff'd*, 278 A.D.2d 35, 717 N.Y.S.2d 154 (2000).............25

*Dunn v. Ladenburg Thalmann & Co.*, 259 A.D.2d 544, 686 N.Y.S.2d 471 (1999).....................25

*Finance America Corp. v. Moyler*, 494 A.2d 926 (D.C. 1985) .....................................................11

*Fishoff v. Abady*, 280 A.D.2d 417, 720 N.Y.S.2d 505 (2001).......................................................28

*Glendora v. Gannett Suburban Newspapers*, 201 A.D.2d 620, 608 N.Y.S.2d 239 (1994)....27, 28

*Greycoat Hanover F St. L.P. v. Liberty Mutual Insurance Co.*, 657 A.2d 764 (D.C. 1995).........11

*Herzfeld & Stern, Inc. v. Beck*, 175 A.D.2d 689, 572 N.Y.S.2d 683 (1991) ................................26

*Hoeppner v. Dunkirk Printing Co.*, 254 N.Y. 95, 172 N.E. 139 (1930)........................................27

*I.G. Second Generation Partners, L.P. v. Duane Reade*, 17 A.D.3d 206, 793 N.Y.S.2d
   379 (2005)....................................................................................................................................22

*I.J.G., Inc. v. Penn-America Insurance Co.*, 803 A.2d 430 (D.C. 2002).......................................12

*Joseph v. Larry Dorman, P.C.*, 177 A.D.2d 618, 576 N.Y.S.2d 588 (1991)................................26

*Leder v. Feldman*, 173 A.D.2d 317, 569 N.Y.S.2d 702 (1991)....................................................27

*Park Knoll Associates v. Schmidt*, 89 A.D.2d 164, 454 N.Y.S.2d 901 (1982).............................25

*Stevens v. United General Title Insurance Co.*, 801 A.2d 61 (D.C. 2002)..............................11, 12

*Toker v. Pollak*, 44 N.Y.2d 211, 376 N.E.2d 163 (1978) .............................................................26

*Travelers Indemnity Co. v. United Food & Commercial Workers International Union*,
   770 A.2d 978 (D.C. 2001) .......................................................................................................11, 12

*Weissman v. Mogol*, 118 Misc. 2d 911, 462 N.Y.S.2d 383 (Sup. Ct. Nassau Co. 1983) ........26, 28

*Williams v. Williams*, 23 N.Y.2d 592, 246 N.E.2d 333 (1969) ....................................................28

## STATE STATUTES

N.Y. Civ. Rights Law § 74 (Consol. 2006) ....................................................................................27

**MISCELLANEOUS**

*American Heritage Dictionary of the English Language* at 462 (1980).........................................12

Fed. R. Civ. P. 56(c) ...................................................................................................................10

Council for Responsible Nutrition, About CRN, http://www.crnusa.org/who_about.html
        (last visited Feb. 14, 2007)................................................................................................ 3-4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNCIL FOR RESPONSIBLE
NUTRITION and
ANNETTE DICKINSON,

          Plaintiffs,

     v.

HARTFORD CASUALTY INSURANCE
COMPANY,

          Defendant.

Case No.: 1:06-CV-01590-RMC

### DEFENDANT HARTFORD CASUALTY INSURANCE COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant Hartford Casualty Insurance Company ("Defendant" or "Hartford"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rules 7 and 56.1 of the Rules of the United States District Court for the District of Columbia, respectfully submits this memorandum of points and authorities in support of its Motion for Summary Judgment.

## I. INTRODUCTION

In this case, Plaintiffs Council for Responsible Nutrition ("CRN"), a trade association of vitamin and food supplement manufacturers, and Annette Dickinson, its former president (collectively "the Plaintiffs") contend that, pursuant to a commercial business insurance policy entered into between the Hartford and the Plaintiffs (the "Policy"), Hartford was obligated to defend the Plaintiffs in a lawsuit (the "Underlying Suit") brought against them in New York state court by ConsumerLab.com, LLC ("ConsumerLab"). In that suit, ConsumerLab alleged that the Plaintiffs' actions in filing a complaint with the Federal Trade Commission, and related public

comments thereon, defamed ConsumerLab and disparaged its products or services. The Plaintiffs contend that certain of the torts alleged in the Underlying Suit fall within the definition of "personal and advertising injury" contained in the Policy.

While Hartford does not dispute that the torts of libel, slander and disparagement are included within the definition of "personal and advertising injury" in its Policy, the Policy also contains an exclusion that clearly excludes from coverage "personal or advertising injury" arising out of an offense committed by the insured with the expectation of inflicting such injury. Here, the facts show that the allegations of the underlying complaint, which control the determination of whether Hartford had a duty to defend, charge the Plaintiffs with engaging in conduct whose very purpose was to accuse ConsumerLab of wrongdoing, to charge it with committing fraudulent and deceptive practices, and to bring government and public scrutiny upon those practices and the very legitimacy of its business. The natural consequences of that conduct, of course, were to inflict injury on ConsumerLab in the form of harm to its reputation and disparagement to its products or services. Under applicable law, therefore, the Plaintiffs were necessarily alleged to have "expected" the alleged injury, and the exclusion in the Policy excludes any coverage, including a duty to defend.

Moreover, the allegations of the underlying complaint do not allege merely that the Plaintiffs committed acts whose natural and probable consequence was to cause injury to ConsumerLab; rather, they allege that the Plaintiffs *intended* to injure ConsumerLab for the benefit of CRN's manufacturer members, and filed the FTC complaint as a *pretext* for making defamatory and disparaging public statements about ConsumerLab. In other words, ConsumerLab alleged not only that the Plaintiffs expected to cause it reputational harm, but also that they intended to do so. While the Policy excludes injury arising out of an offense committed

2

by the insured "with the expectation of inflicting" it, and not just injury that is caused "with the intention of inflicting" it, the degree of culpability alleged against the Plaintiffs in the Underlying Suit leaves no doubt that the Hartford exclusion applies.

Finally, the high level of culpability that ConsumerLab alleged against the Plaintiffs was not alleged merely to support some of its claims, or to support only a claim for enhanced or punitive damages, but was integral to all of the claims ConsumerLab raised in its complaint, because under applicable law ConsumerLab could not state a legal claim against the Plaintiffs unless it alleged that the Plaintiffs acted for the purpose of causing it harm. This is because the factual context of the alleged acts and statements of the Plaintiffs—that is, filing a complaint with the FTC and related public commentary—gave rise to potential defenses to liability based on privileges for petitioning the government, for statements in a quasi-judicial proceeding, or for making comment on official proceedings, and the only way for ConsumerLab to foreclose those defenses was to allege that the Plaintiffs instituted the FTC complaint as a pretext to cause ConsumerLab intentional harm. Therefore, all of ConsumerLab's claims hinged on alleging that the Plaintiffs acted for the purpose of inflicting injury on ConsumerLab, bringing them squarely within the exclusion in the Policy.

Accordingly, based on the undisputed facts, Hartford is entitled to judgment as a matter of law declaring that it did not have a duty to defend the Underlying Suit.

## II.    FACTUAL STATEMENT

The following facts are undisputed.

### A.    The Parties

CRN is a trade association representing ingredient suppliers and manufacturers in the dietary supplement industry. Council for Responsible Nutrition, About CRN,

http://www.crnusa.org/who_about.html (last visited Feb. 14, 2007).  CRN was and is a non-profit

corporation formed and existing by virtue of the laws of the District of Columbia with its

principal place of business in the District of Columbia.  Complaint ¶ 2.[1]  Annette Dickinson, the

president of CRN at the time the events at issue took place, was a citizen and resident of Mount

Airy, Maryland, and currently resides in Minnesota.  *Id.* ¶ 3.

Hartford was and is an Indiana corporation with its principal place of business in

Hartford, Connecticut.  *Id.* ¶ 4.  At all times relevant hereto, Hartford was licensed to conduct

business in the District of Columbia.  *Id.*

### B.    The Underlying Suit

On April 5, 2005, ConsumerLab filed the Underlying Suit against CRN and Dickinson in

the Supreme Court of New York, County of Westchester.  Verified Complaint,

*ConsumerLab.com, LLC v. Council for Responsible Nutrition, et al.*, Index No. 05-04998 (N.Y.

Sup. Ct. Westchester Co.) ("Underlying Complaint") (attached as Exhibit 2 to the Declaration of

Patrick F. Hofer in Support of Hartford's Motion for Summary Judgment ("Hofer Decl."),

submitted herewith).  The Underlying Complaint alleges that on January 12, 2005, CRN filed a

petition or a request for an investigation ("CRN Petition") with the FTC, requesting that an

enforcement action be brought against ConsumerLab because it had engaged in "unfair business

practices."  *Id.* ¶ 15.  According to the Underlying Complaint, the CRN Petition alleged that

ConsumerLab engaged in a deceptive scheme whereby it "requires supplement manufacturers to

pay a fee to obtain favorable publicity for positive test results or to avoid unfavorable publicity

for negative test results."  *Id.*  ConsumerLab also alleged that the CRN Petition charged that,

while the fee-paying manufacturers enjoyed the benefit of having their positive test results

---

[1] The unmodified term "Complaint" as used herein means the complaint filed in this case by Plaintiffs.  The term
"Underlying Complaint" refers to the complaint filed by ConsumerLab against Plaintiffs in New York state court,
for which Plaintiffs seek coverage.

publicized on ConsumerLab's website, manufacturers who refused to accede to the scheme suffered because, even if their test results were positive, they received no publicity and their products were omitted from the list of passing products. *Id.*

ConsumerLab also alleged that the CRN Petition asserted that "ConsumerLab's deceptive acts violate the FTC Act" in two ways: "First, ConsumerLab misleads the public by failing to provide material information and by advertising itself as independent of the product manufacturers;" and "[s]econd, ConsumerLab deceives consumers into believing that ConsumerLab itself conducts product testing." *Id.* The CRN Petition concluded that ConsumerLab's "entire business model represents an egregious form of consumer fraud and deception" and urged "prompt investigation and swift enforcement to curtail ConsumerLab's unfair business practices." *Id.* ConsumerLab alleged that CRN posted a copy of the CRN Petition on its website. *Id.* ¶ 9.

ConsumerLab alleged that CRN also posted a defamatory press release on its website and on a public newswire, which cited to the Internet address of the CRN Petition on CRN's website. *Id.* ¶¶ 16-17. The Underlying Complaint also alleged that CRN furnished advance copies of the CRN Petition to certain media outlets, including the Wall Street Journal, which published an article about the CRN Petition and its allegations. *Id.* ¶ 12.

ConsumerLab alleged that CRN's "membership consists of suppliers and manufacturers of vitamins and dietary supplements and also includes two associate members which are competitors of" ConsumerLab. *Id.* ¶ 2.

The Underlying Complaint asserted a number of causes of action, including defamation, injurious falsehoods, trade libel, infliction of intentional harm and tortious interference with contractual relationships. ConsumerLab alleged that the Plaintiffs "published statements"

regarding ConsumerLab "with the intent of causing harm to" ConsumerLab. *Id.* ¶ 52. Further, as part of the "Factual Background" incorporated into every count asserted in the Underlying Complaint, ConsumerLab alleged the following:

- "[Plaintiffs] used the existence of the CRN Complaint for a broad-based media campaign, which included press releases, and which *was intended to, and did, defame* [ConsumerLab] and cause damages to [ConsumerLab's] business income and business reputation." *Id.* ¶ 10 (emphasis added).

- "The CRN Complaint *was not intended as a truthful and legitimate complaint* of claimed violations of the statues and regulations for which the FTC is an enforcement agency *but, instead, was a pretext to purposefully and maliciously initiate and conduct a widespread defamatory media campaign* against [ConsumerLab].  To whatever extent [Plaintiffs'] filing might otherwise have been subject to a qualified privilege, that privilege has been overcome, waived and nullified." *Id.* ¶ 11 (emphasis added).

- "Prior to the acceptance by the FTC of the filing of the CRN Complaint, [Plaintiffs] furnished advance copies of the CRN Complaint to certain news reporters, including a reporter for the Wall Street Journal which published an article about the CRN Complaint in the January 13th edition of the Wall Street Journal." *Id.* ¶ 12.

- *"[A] principal purpose of [Plaintiffs'] defamatory media campaign against [ConsumerLab] was to silence [ConsumerLab]* and thereby cut off the flow of legitimate consumer information published by [ConsumerLab] in a misguided effort that by doing so [CRN] would be shielding CRN's members

from any adverse findings in [ConsumerLab's] *bona fide* test results of products manufactured and distributed by CRN's members." *Id.* ¶ 13 (emphasis added).

- "The charges which you [*i.e.*, CRN] filed against [ConsumerLab] with the FTC . . . had as their essential purpose, to silence [ConsumerLab] and wreak vengeance upon [ConsumerLab] for disclosing the failings of some of your industry and, perhaps, benefit certain of CRN's associate members which are competitors of [ConsumerLab]. We also believe that a Court will find that your [i.e., CRN's] actions, and especially the simultaneous wide dissemination of the charges, were unlawful and defamatory and ***were maliciously designed to undermine [ConsumerLab] and its business*.**" *Id.* ¶ 22 (emphasis added).

CRN and Dickinson filed a motion to dismiss the Underlying Suit for failure to state a claim. Complaint ¶ 23. On or about May 16, 2006, the court in the Underlying Suit dismissed all the counts in the Underlying Complaint, except for one. *Id.* CRN has since advised Hartford that the Underlying Suit has been settled and dismissed. Hofer Decl. ¶ 6.

**C.    The Hartford Policy**

Hartford issued a commercial business insurance policy to CRN numbered 42 SBA FT4964, which covered the policy period April 1, 2004, to April 1, 2005. Complaint ¶ 7 (the Policy is attached as Exhibit 1 to the Hofer Declaration). Pursuant to the Policy's Business Liability Insurance Coverage Form, the Policy provided coverage for certain liability the insureds may have to third parties, as specified in the Policy. Policy at HART000049-70.

In pertinent part, the Policy provides:

### A. COVERAGES

**1. BUSINESS LIABILITY COVERAGE (BODILY INJURY, PROPERTY DAMAGE, PERSONAL AND ADVERTISING INJURY)**

**Insuring Agreement**

a.     We will pay on behalf of the insured those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply.

*Id.* at HART000051; *see also* Complaint ¶ 10.

"Personal and advertising injury" is defined in the Policy as follows:

"Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

\*     \*     \*

d.     Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

Policy at HART000069; *see also* Complaint at ¶ 11.

The Policy contains the following exclusion:

### B. EXCLUSIONS

**1. Applicable to Business Liability Coverage**

This insurance does not apply to:

**a.     Expected or Intended Injury**

\*     \*     \*

**(2)** "Personal and advertising injury" arising out of an offense committed by, at the direction of or with the consent or acquiescence of the insured with the expectation of inflicting "personal and advertising injury".

8

Policy at HART000054.

### D.    **The Coverage Dispute**

In April of 2005, the Plaintiffs tendered the Underlying Complaint to Hartford. Complaint ¶ 31. On or about April 29, 2005, Hartford disclaimed any duty to defend or indemnify the Plaintiffs with regard to the Underlying Complaint, citing Exclusion 1.a.(2) of the Policy. *Id.* ¶ 31. Counsel for both parties discussed the disputed issue of Hartford's duty to defend via letter, but neither party's position changed. *Id.* ¶¶ 36-40.

On September 13, 2006, the Plaintiffs filed the Complaint in this case. *Id.* ¶ 1.

## III.    **ARGUMENT**

Under District of Columbia law (which, based on application of D.C. choice-of-law principles, applies to the coverage dispute here), the issue of whether Hartford has a duty to defend is determined by comparing the allegations of the Underlying Complaint to the terms of the Policy. Applying that standard, the Underlying Complaint clearly does not state a claim covered by Hartford. First, the acts of the Plaintiffs, as alleged in the Underlying Complaint, unequivocally have as their natural and probable consequence injury to the reputation of ConsumerLab and disparagement of its products and services. Simply put, the Plaintiffs' alleged acts were no accident, and the natural and probable consequence of those acts was the injury alleged by ConsumerLab. Such injury is therefore "expected" under D.C. law, and excluded under the Policy.

Second, even though the *Plaintiffs' acts*, as alleged, are sufficient to conclude that the resultant injury alleged must have been expected, in fact ConsumerLab's complaint contains specific allegations of the *Plaintiffs' state of mind*, and that state of mind is clearly alleged not

only to expect ConsumerLab's injury, but to intend it as the very purpose of the Plaintiffs' acts. This cements the conclusion that the Hartford exclusion applies here.

Finally, the state of mind alleged by ConsumerLab against the Plaintiffs, *i.e.*, maliciously to injure ConsumerLab, was legally essential to ConsumerLab's assertion of all its claims, as otherwise those claims would have been barred by absolute privileges to civil liability. Those privileges could only be shown to be inapplicable if ConsumerLab alleged, as it did, that the Plaintiffs initiated the FTC proceeding illegitimately and as pretext to injure ConsumerLab, such that the proceeding never gave rise to a privilege. Given the legal necessity of alleging that intent, it imbued all claims that ConsumerLab asserted, and it was legally impossible for ConsumerLab to recover on a claim based on a less-culpable state of mind. As a result, the exclusion applied as a matter of law.

### A.    Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The parties here agree that the issue of whether Hartford had a duty to defend the Underlying Suit presents an issue of law that can be decided based on undisputed facts.

### B.    The Duty to Defend Is Determined by Comparing the Allegations of the Underlying Complaint to the Terms of the Insurance Policy

It is undisputed that the Policy was issued to CRN, a D.C. corporation with its principal office in Washington, D.C. District of Columbia choice of law principles, which this Court is bound to apply sitting in a diversity case, therefore indicate that application of D.C. substantive law to the contract dispute here is appropriate.[2]

---

[2] As a federal court sitting in diversity, this Court is bound to apply D.C. choice of law principles. *YWCA v. Allstate Ins. Co.*, 275 F.3d 1145, 1150 (D.C. Cir. 2002). The District of Columbia has adopted the Restatement (Second) of Conflict of Laws § 188. *See Ideal Elec. Sec. Co. v. International Fid. Ins. Co.*, 129 F.3d 143, 148 (D.C. Cir. 1997);

" 'Where [insurance] contract language is not ambiguous, summary judgment is appropriate because a written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence.' " *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 66 (D.C. 2002) (quoting *Travelers Indem. Co. v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 985 (D.C. 2001)). "An insurance contract is not 'ambiguous merely because the parties do not agree on the interpretation of the contract provision in question.' " *Travelers Indem. Co.*, 770 A.2d at 986 (quoting *Byrd v. Allstate Ins. Co.*, 622 A.2d 691, 694 (D.C. 1993)).

In determining whether a duty to defend exists, D.C.'s "long standing case law requires [courts] to examine both the complaint and the insurance policy," which is known as the "eight corners rule." *Stevens*, 801 A.2d at 66 n.4. Specifically, the D.C. Court of Appeals has delineated "the general rule governing the duty of an insurance company to defend," as follows:

> The obligation of the insurance company to defend an action against an insured, as distinguished from its obligation to pay a judgment in that action, by the overwhelming weight of authority is to be determined by the allegations of the complaint . . . . If the allegations of the complaint state a cause of action within the coverage of the policy the insurance company must defend. On the other hand, if the complaint alleges a liability not within the coverage of the policy, the insurance company is not required to defend. In case of doubt such doubt ought to be resolved in the insured's favor.

*Travelers Indem. Co.*, 770 A.2d at 986 (quoting *S. Freedman & Sons, Inc., v. Hartford Fire Ins. Co.*, 396 A.2d 195, 197 (D.C. 1978)); *see also Stevens*, 801 A.2d at 66-67 & n.5; *American Cont'l Ins. Co. v. Pooya*, 666 A.2d 1193, 1198 (D.C. 1995) (quoting *Freedman*).

---

*Finance America Corp. v. Moyler*, 494 A.2d 926, 929 & n.7 (D.C. 1985). Under Section 188, where the parties have not specified controlling law in their contract, "the Restatement approach requires the court to weigh various jurisdictions' contacts with the transaction at issue and to determine which has the most substantial interest in the matter." *Ideal Elec.*, 129 F.3d at 148. Where the insured was a D.C. corporation and the underlying events took place in D.C., courts applying D.C. law have held that D.C. law controls issues of insurance coverage. *See Nationwide Mut. Ins. Co. v. Richardson*, 270 F.3d 948, 953 (D.C. Cir. 2001); *Greycoat Hanover F St. L.P. v. Liberty Mut. Ins. Co.*, 657 A.2d 764, 768 (D.C. 1995); *Potomac Elec. Power Co. v. Cal. Union Ins. Co.*, 777 F. Supp. 968, 973 (D.D.C. 1991).

Under the "eight-corners rule," the allegations of the underlying complaint control the determination of whether there is a duty to defend: " 'The duty to defend depends only upon the facts as alleged to be,' so that the '[insurer's] obligations should be measured by comparing the policy it issued with the complaint filed [in the underlying case].' " *Travelers Indem. Co.*, 770 A.2d at 987 (quoting *Freedman,* 396 A.2d at 197); *see also Stevens*, 801 A.2d at 67. As a result, the "obligation to defend 'is not affected by facts ascertained before suit or developed in the process of litigation or by the ultimate outcome of the suit.' " *Travelers Indem. Co.*, 770 A.2d at 987 (quoting *Boyle v. Nat'l Cas. Co.*, 84 A.2d 614, 615 (D.C. 1951)); *see also Stevens*, 801 A.2d at 67.

If the underlying complaint clearly alleges a claim that is excluded under the terms of the policy, the insurer has no duty to defend, and neither the insured's "resourceful and inventive exegesis of the pleading," nor its "*explication de texte*[3] can enlarge or alter the plain meaning of the complaint." *I.J.G., Inc. v. Penn-America Ins. Co.*, 803 A.2d 430, 435 (D.C. 2002) (adopting trial court opinion of Bayly, J.) (holding no duty to defend suit where alleged injury fell within exclusion for injury "resulting from assault and battery or physical altercations").[4]

### C.    Hartford Did Not Have a Duty to Defend Because the Underlying Complaint Alleged that the Plaintiffs Committed an Offense with the Expectation of Inflicting Injury

The Policy does not apply to "expected or intended injury;" specifically, it states:

This insurance does not apply to:

### a.    Expected or Intended Injury

---

[3] "*Explication de texte*" means "A method of literary criticism in which a detailed reading and analysis of a given text in each of its linguistic, compositional and expressive parts and aspects is followed by a synthesizing exposition of these with relation to each other and to the whole work." *American Heritage Dictionary of the English Language* at 462 (1980).

[4] In general, "[t]he insurer has the burden of proving the applicability of a policy exclusion." *Stevens*, 801 A.2d at 67 n.6.

\*     \*     \*

> (2) "Personal and advertising injury" arising out of an offense committed by, at the direction of or with the consent or acquiescence of the insured with the expectation of inflicting "personal and advertising injury".

Policy at HART000054.

### 1.    Injury That Is the Natural and Probable Consequence of the Insured's Actions Is "Expected"

Several cases interpreting D.C. law have analyzed under what circumstances injury is "expected" and therefore not covered by insurance. In construing whether injuries were "accidental" under a disability insurance policy, the D.C. Court of Appeals held that injuries are not accidental when "they were a natural or probable result of the insured's actions reasonably foreseeable by him, or by a reasonably prudent man in his position." *Byrd v. Nationwide Mut. Ins. Co.*, 415 A.2d 807, 809 (D.C. 1980). In that case, the court affirmed a judgment that the insured's injury—being shot by the police after he first shot at the police—was the natural and probable consequence of his act, and therefore not accidental. *Id.*

This Court applied the *Byrd* reasoning in the context of liability insurance. In *Puritan Ins. Co. v. 1330 Nineteenth Street Corp.*, the liability insurance policy at issue defined an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." Nos. 83-2228 and 83-1754, 1984 U.S. Dist. LEXIS 18477, at *7 (D.D.C. Mar. 19, 1984). The Court opined that "[t]his definition confines the triggering event to an unintended action that causes unforeseen harm." *Id.* Further, the Court observed that: "Under the test in the District of Columbia, 'injuries may be regarded as accidental unless they were a natural or a

probable result of the insured's actions reasonably foreseeable by him, or by a reasonably prudent man in that position.' " *Id.* at *7 (quoting *Byrd*).

This Court similarly interpreted the "occurrence" definition in *Travelers Indem. Co. v. Walburn*, 378 F. Supp. 860 (D.D.C. 1974). In that case, Travelers sought a declaratory judgment that it was not obligated to defend certain claims or indemnify against any liability arising out of claims pending against its insured, Walburn. *Id.* at 861. Walburn was convicted by jury verdict of second-degree murder. *Id.* Pursuant to a homeowners policy that Travelers had issued to Walburn, he requested the insurance company to defend him in a wrongful death action related to the same killing. *Id.* at 862. Travelers argued that the killing was not an "occurrence," as defined by the policy, and therefore it had no duty to defend Walburn. *Id.*

The policy at issue defined an "occurrence" as "[an] accident… which results, during the policy term, in bodily injury neither *expected nor intended from the standpoint of the Insured*." *Id.* (emphasis in original). Therefore, as the Court said, "the question of coverage in this case rises or falls on whether the killing was an accident 'neither expected nor intended from the standpoint of the Insured.' " *Id.* at 865-66. "[I]f Mr. Walburn either intended to do serious bodily injury" to the victim "or expected such a result from his actions, then there is no coverage." *Id.* at 866. Additionally, the Court noted that "the question of whether the jury in the criminal trial found such intent or expectation is inextricably intertwined with their finding of malice." *Id.*

The Court reasoned as follows:

> Thus, although a second degree murder may be an accident, this does not resolve the question of coverage since the insurance policy is written in the disjunctive; there is only coverage if the occurrence was neither intended nor expected. Although this second degree murder may have been unintended, the Court reaches the inescapable conclusion that a second degree murder conviction could only have been returned by the jury if they found that Walburn expected that serious

14

bodily injury would be the result of his actions; such a result is inherent in the finding of malice.

* * *

If the jury in the Walburn criminal trial used either one of the standards described in *Belton* [*v. United States*, 127 U.S. App. D.C. 201, 204-05, 382 F.2d 150, 153-54 (1967)], and they were so instructed by Judge Robinson, then they either found intent to do serious bodily injury or at least *under the "reasonable man" objective standard found that Mr. Walburn must be held to have foreseen such a result as likely. As this Court interprets the clear terms of the exclusionary clause, the latter finding is tantamount to a decision that the injury was expected from Mr. Walburn's viewpoint* thus removing any obligation of Travelers under the policy.

*Id.* at 867-68 (emphasis added). The Court therefore equated a jury's finding that an insured "must have foreseen such a result as likely" with the conclusion that injury was "expected," and consequently not covered, under an insurance policy.

As these cases make clear, courts applying District of Columbia law, including this Court, have concluded that "expected injury" is injury that is the natural and probable consequence of an insured's acts, reasonably foreseeable either by the insured or a reasonable person in the insured's position.

The Tenth Circuit recently applied this same standard in a case involving the same policy language at issue here and found that the insurer did not have a duty to defend a suit because the allegations against the insured made clear that the injury alleged was the natural and probable consequence of the insured's acts. *Freightquote.com, Inc., v. Hartford Cas. Ins. Co.* 397 F.3d 888 (10th Cir. 2005). There, the insured, Freightquote.com, Inc., ("Freightquote") was an Internet shipping broker that acted as an intermediary between shippers and carriers through its website. One customer, a freight brokerage called Gateway, had used Freightquote to make numerous shipments, but had failed to make payment to Freightquote. Freightquote then sought payment directly from all of Gateway's customers, sending them a letter which instructed them

not to pay Gateway for freight services arranged through Freightquote.com, and to cancel any such payments that had been made. Further, the letter informed the customers that they were legally liable for any charges that had not been paid to the carriers by Gateway through Freightquote.com, and invited them to establish an account directly with Freightquote. *Id.* at 890. Finally, the letter stated that Freightquote had notified the Florida State's Attorneys Office and the FBI of Gateway's conduct, and referred to an attached *Miami Herald* article, entitled "19 from crime family indicted," which, according to the letter, concerned "some of the principals at Gateway." *Id.* Gateway was not mentioned in the article, but it identified a Gateway officer as one of the "crime family" members indicted for racketeering. *Id.*

Gateway sued Freightquote for tortious interference with contractual and business relations. Freightquote sought a defense from Hartford. Hartford disclaimed a duty to defend on the ground that the injury alleged in the Gateway suit was excluded because it was "personal and advertising injury arising out of an offense committed by, at the direction of or with the consent or acquiescence of the insured with the expectation of inflicting personal and advertising injury." *Id.* at 891.

In the ensuing coverage litigation, the district court, applying Kansas law, held that the acts allegedly undertaken by Freightquote left "little doubt that the natural and probable consequence of the Letter was to intentionally disparage the business services of Gateway," and that "the only natural and probable consequence" of sending the *Miami Herald* article "was to insinuate, perhaps wrongly, that Gateway could not be trusted and was involved in criminal activity." *Freightquote*, 316 F. Supp. 2d 937, 942 (D. Kan. 2003). The court concluded its analysis by underscoring that

> the court cannot escape the conclusion that the Letter, on its face, shows that
> plaintiff intended to injure Gateway. The Letter requested that Gateway

16

> customers pay plaintiff directly, and, if they already had paid Gateway, to stop payment. Obviously, Gateway's business would be injured if its customers either did not pay or canceled payments already sent. The Letter also stated that plaintiff would like to assist Gateway's customers in establishing an account directly with plaintiff and to call to speak to one of its "New Business Sales Representatives." The obvious consequence in including this language was for Gateway's customers to establish a direct account with plaintiff, especially when coupled with plaintiff's reference to Gateway's alleged criminal activities. All these factors taken together clearly demonstrate that *the natural and probable consequence of plaintiff's dissemination of the Letter was to injure* Gateway's contractual and business relations.

*Id.* at 943 (emphasis added). Accordingly, the district court held that the "expectation of inflicting injury" exclusion applied to Gateway's claims against Freightquote, and that Hartford therefore did not have a duty to defend or indemnify Freightquote. The Tenth Circuit affirmed, largely adopting the logic of the district court: "[T]he only conclusion a reasonable trier of fact could reach is that the natural and probable consequence of Freightquote's actions was to intentionally interfere with Gateway's contractual and business relations." 397 F.3d at 894.

### 2. The Underlying Complaint Clearly Alleges that the Plaintiffs Expected to Inflict "Personal and Advertising Injury"

Applying the rule of these cases to the facts here shows that the Plaintiffs' alleged conduct in submitting the CRN Petition to the FTC and in making related public commentary had as its natural and probable consequence the infliction of injury on ConsumerLab, in the form of harm to its reputation and of disparagement to its products and services.

The Underlying Complaint alleges, and it is undisputed, that the Plaintiffs intentionally filed the CRN Petition with the FTC, posted a copy of the CRN Petition on their website, and issued a press release. The very purpose of the CRN Petition was to invite government scrutiny into ConsumerLab's business, making multiple allegations of legal or ethical wrongdoing:

- "ConsumerLab's promotional activities are unfair and deceptive under section 5 of the Federal Trade Commission Act." CRN Petition at 1.

17

- "ConsumerLab deceives the public by falsely implying that it operates a laboratory." *Id.* at 2.

- "Despite its name and its claims of independence, ConsumerLab is highly dependent on payments from industry. ConsumerLab hides what it is paid to hide and publicizes what it is paid to publicize." *Id.* at 4.

- "ConsumerLab falsely and fraudulently invites consumers to subscribe to the website." *Id.*

- "This entire business model represents an egregious form of consumer fraud and deception." *Id.* at 7.

CRN's public statements about the CRN Petition repeat many of these statements and re-assert that ConsumerLab's business model in essence constitutes a shake-down scheme, by threatening to publicize adverse test results unless it was paid, and promising to keep adverse results unpublished if it were. Press Release at 1, Hofer Decl. Exh. 2 (attached as Exhibit B to the Underlying Complaint).

There is no question that these statements of CRN, as alleged in the Underlying Complaint, had as their natural and probable consequence the infliction of reputational harm on ConsumerLab. The statements charged ConsumerLab with extensive wrongdoing, including fraud, deception, unfair trade practices, operating a shake-down scheme, and misrepresenting its services. These charges were not made under seal or *in camera*, but were published to newspapers and on CRN's website. The only conclusion one can reach is that injury to ConsumerLab's reputation and disparagement of its services was the natural and probable consequence of the CRN Petition and related published statements.

Like the letter in *Freightquote*, the "language of the [CRN Petition] denigrates and discredits" ConsumerLab's services. *See Freightquote,* 397 F.3d at 894; *see also Freightquote*, 316 F. Supp. 2d at 942 ("More significantly, upon examination of the contents of the Letter, as well as the attached Miami Herald article, both of which were attached to the Verified Complaint, there is little doubt that the natural and probable consequence of the Letter was to intentionally disparage the business services of Gateway."). Indeed, logic dictates that conclusion, since, at a minimum, the Plaintiffs' purported purpose in filing the CRN Petition, as expressly stated therein, was to instigate an FTC enforcement action regarding ConsumerLab's alleged unfair and deceptive acts; that result simply could not be accomplished without the *expectation* of injuring the reputation of ConsumerLab.

Moreover, given the nature of the wrongdoing and the wide dissemination CRN allegedly sought to give its charges, that injury was reasonably foreseeable to CRN, or to a reasonable person in its position. Regardless of whether the charges were true, or whether CRN was justified or on solid ground in making them, the injury ConsumerLab alleged in its Underlying Complaint clearly was alleged to arise out of an offense "committed by [Plaintiffs] with the expectation of inflicting" that injury. As a result, the Hartford exclusion clearly applies, and Hartford had no duty to defend.

### 3. The Underlying Complaint Specifically Alleges that the Plaintiffs Intended to Injure ConsumerLab

Although the Plaintiffs' acts as alleged in the Underlying Complaint are sufficient to conclude that they were alleged to have "expected" the injury at issue, because that injury was the natural and probable consequence of those acts, the Underlying Complaint goes further, and specifically alleges the Plaintiffs' state of mind. The Underlying Complaint is replete with

allegations that the Plaintiffs intended to injure and "wreak vengeance" upon ConsumerLab. Indeed, that injury is alleged to be the very purpose of the Plaintiffs' acts:

- "[Plaintiffs] used the existence of the CRN Complaint for a broad-based media campaign, which included press releases, and which *was intended to, and did, defame* [ConsumerLab]." *Id.* ¶10 (emphasis added).

- "The CRN Complaint *was not intended as a truthful and legitimate complaint* of claimed violations of the statues and regulations for which the FTC is an enforcement agency *but, instead, was a pretext to purposefully and maliciously initiate and conduct a widespread defamatory media campaign* against [ConsumerLab]. *Id.* ¶ 11 (emphasis added).

- "*[A] principal purpose of [Plaintiffs'] defamatory media campaign against [ConsumerLab] was to silence [ConsumerLab]* and thereby cut off the flow of legitimate consumer information published by [ConsumerLab] in a misguided effort that by doing so [CRN] would be shielding CRN's members from any adverse findings in [ConsumerLab's] *bona fide* test results of products manufactured and distributed by CRN's members." *Id.* ¶ 13 (emphasis added).

- "The charges which you [*i.e.*, CRN] filed against [ConsumerLab] with the FTC . . . had as their essential purpose, to silence [ConsumerLab] and *wreak vengeance upon [ConsumerLab]* . . . and *were maliciously designed to undermine [ConsumerLab] and its business*." *Id.* ¶ 22 (emphasis added).

These allegations of the Plaintiffs' intent to injure only buttress the necessary conclusion drawn from the allegations of the Plaintiffs' acts: that the Plaintiffs were alleged to have

expected or intended the injury of which ConsumerLab complained.  As a consequence, the

Hartford exclusion applies, and Hartford had no duty to defend.

### D.    The Facts Alleged in the Underlying Complaint Made any Liability for an Offense with a Covered State of Mind a Legal Impossibility

The Plaintiffs have asserted in their Complaint, and may argue now, that the inclusion of

certain words in the Underlying Complaint created the possibility that it could have been held

liable for "personal and advertising injury" *without* a showing that it committed an offense "with

the expectation of inflicting" that injury.  *See* Complaint ¶¶ 15-16, 26.  In particular, the

Plaintiffs may assert that the allegation that the Plaintiffs acted "with reckless disregard of

whether the statement was false or not," Complaint ¶ 25, is sufficient to create the potential of a

covered claim and, therefore, a duty to defend.  In this regard, the Plaintiffs may seek to rely on

the D.C. Court of Appeals' opinion in *Pooya*, 666 A.2d 1193 (D.C. 1995).  In that case, the court

held that if an insured's conduct in defaming a third party "was reckless, and not malicious,

knowing or wilful, his actions would be covered," *id.* at 1199, under an insurance policy that

covered only "an accident, error or omission neither expected nor intended by the insured which

results in injury," *id.* at 1194.

Any reliance the Plaintiffs may place on allegations of "reckless disregard" and the

holding in *Pooya* is misplaced, however, because of a fundamental distinction between *Pooya*

and this case.  While *Pooya* found that "it was possible" that the insured "could be liable for

defamation without intentional acts being proven," *id.* at 1199, in this case it was legally

impossible for the Plaintiffs to be found liable without the allegation and proof of intent to injure,

because, as demonstrated below, ConsumerLab had to allege and prove that intent to foreclose

applicable privileges.

### 1.    The Underlying Complaint Necessarily Alleged Intent to Cause Personal Injury to Demonstrate that CRN and Dickinson Were Never Entitled to Assert a Privilege

The Underlying Complaint necessarily alleged that the Plaintiffs intended to cause personal injury to demonstrate that the Plaintiffs were not entitled to a defense of absolute privilege. Under New York law, which ConsumerLab alleged applied to the Underlying Suit, ConsumerLab faced three hurdles to assertion of its defamation claim: (1) the absolute privilege under the *Noerr-Pennington* doctrine, which generally shields from civil liability those who seek to petition the government; (2) the common law absolute privilege for statements made in judicial or quasi-judicial proceedings; and (3) the absolute privilege under Section 74 of the New York Civil Rights Law, which protects from liability "fair and true reports" of judicial proceedings.

Based upon the facts alleged in the Underlying Suit, the only way ConsumerLab could state a defamation or disparagement claim that would foreclose these privileges was to allege that the Plaintiffs submitted the CRN Petition to the FTC illegitimately and as a pretext to injure ConsumerLab through a defamatory media campaign. The Underlying Complaint makes precisely those allegations.

### a)    The *Noerr-Pennington* Doctrine

The *Noerr-Pennington* doctrine provides that a person "may not be subjected to liability for petitioning the government." *I.G. Second Generation Partners, L.P. v. Duane Reade*, 17 A.D.3d 206, 208, 793 N.Y.S.2d 379, 381 (2005); *Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc.*, 268 A.D.2d 101, 106-07, 707 N.Y.S.2d 647, 652 (2000) ("citizens who petition the government for governmental action favorable to them cannot be prosecuted.").[5]

---

[5] The *Noerr-Pennington* doctrine traces from the U.S. Supreme Court holdings in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers v. Pennington*, 381 U.S.

The *Noerr-Pennington* doctrine immunizes direct statements to the government as well as statements made in the course of a campaign designed to influence public opinion and encourage government action. *Alfred Weissman*, 268 A.D.2d at 103-04, 707 N.Y.S.2d at 650.  The immunity provided by the *Noerr-Pennington* doctrine is absolute.  *Id.* at 107-09, 707 N.Y.S.2d at 653; *see also Concourse Nursing Home v. Engelstein*, 181 Misc. 2d 85, 89-90, 692 N.Y.S.2d 888, 891 (Sup. Ct. New York Co. 1999) ("Under the *Noerr-Pennington* doctrine, defendants' motives . . . are irrelevant"), *aff'd*, 278 A.D.2d 35, 717 N.Y.S.2d 154 (2000).

The *Noerr-Pennington* doctrine is subject to a "sham" exception, however.  As recognized by the New York Appellate Division, "[t]he 'sham' exception to the *Noerr-Pennington* doctrine comes into play when the party petitioning the government is not at all serious about the object of the petition, but does so merely to inconvenience its competitor, or to preclude or delay its competitor's access to governmental process." *Alfred Weissman*, 268 A.D.2d at 109, 707 N.Y.S.2d at 654; *see also Concourse Nursing Home*, 181 Misc. 2d at 90, 692 N.Y.S.2d at 892 (sham exception voids protection where "a defendant is using the petitioning process as a means of interference or harassment").  "A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable governmental action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means." *Id.*  The sham exception "encompasses situations in which persons use the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon." *Id.* (citing *City of Columbia v. Omni Outdoor Adv.*, 499 U.S. 365, 380 (1991)).

---

657 (1965).  The *Noerr-Pennington* doctrine initially arose in the antitrust field.  *Id.*  Courts have expanded the *Noerr-Pennington* doctrine to protect First Amendment petitioning of the government from claims brought under Federal and State law.  *See Alfred Weissman*, 268 A.D.2d at 107, 707 N.Y.S.2d at 652.

In the present case, ConsumerLab alleged in the Underlying Complaint that the Plaintiffs petitioned the FTC for action, and by doing so, and by making public statements about its petition, defamed ConsumerLab.  To preclude the inevitable assertion of the defense of *Noerr-Pennington* doctrine arising out of those facts, ConsumerLab additionally had to, and did in fact, allege that the Plaintiffs' petitioning activity was a sham instituted for the purpose of launching a defamatory media campaign against ConsumerLab:

> **The CRN Complaint was not intended as a truthful and legitimate complaint** of claimed violations of the statues and regulations for which the FTC is an enforcement agency but, instead, **was a pretext to purposefully and maliciously initiate and conduct a widespread defamatory media campaign** against [ConsumerLab].  To whatever extent [CRN's] filing might otherwise have been subject to a qualified privilege, that privilege has been overcome, waived and nullified.

Underlying Complaint ¶ 11 (emphasis added).

ConsumerLab further invoked the sham exception in the Underlying Complaint by alleging that the CRN Petition was an attempt by the Plaintiffs to interfere with ConsumerLab's business relationships.

> [CRN] used the existence of the CRN Complaint for a broad-based media campaign, which included press releases, and which was intended to, and did, defame [ConsumerLab] and cause damage to [ConsumerLab's] business income and business reputation.

*Id.* ¶ 10.  Moreover, ConsumerLab alleged that the Plaintiffs filed the CRN Petition with the FTC as a means to advance the interests of two of its members who are also competitors of ConsumerLab.

> [CRN] improperly filed a false and defamatory CRN Complaint and press release of and concerning [ConsumerLab] with the intent of injuring [ConsumerLab] while benefiting and advancing the business of one or more of the members of [CRN].

*Id.* ¶ 57; *see also id.* ¶ 13 (CRN "would be shielding CRN's members"); *id.* ¶ 22 (alleging that CRN's charges were intended to "wreak vengeance" on ConsumerLab, perhaps to "benefit CRN's associate members which are competitors of [ConsumerLab]").

Accordingly, ConsumerLab sought to invoke the sham exception by alleging that the Plaintiffs intentionally submitted the CRN Petition as a pretext in order to execute a malicious defamatory campaign, including to interfere with the business relationships of ConsumerLab, a competitor of certain members of the Plaintiffs' organization. That allegation was legally necessary to preclude application of the *Noerr-Pennington* doctrine, which would otherwise bar liability.

### b)    The Absolute Privilege for Statements in Judicial and Quasi-Judicial Proceedings

New York law recognizes a similar common law absolute privilege for statements made in official proceedings, as opposed to government petitions. "Statements uttered in the course of judicial or quasi-judicial proceedings are absolutely privileged so long as they are material and pertinent to the questions involved and notwithstanding the motive with which they are made." *Dunn v. Ladenburg Thalmann & Co.*, 259 A.D.2d 544, 545, 686 N.Y.S.2d 471, 472 (1999). Absolute immunity extends to administrative proceedings, or quasi-judicial proceedings, "where such proceedings are adversarial, result in a determination based upon the application of appropriate provisions in the law to the facts and which are susceptible to judicial review." *Park Knoll Assoc. v. Schmidt*, 89 A.D.2d 164, 171, 454 N.Y.S.2d 901, 906 (1982), *rev'd on other grounds*, 59 N.Y.2d 205, 451 N.E.2d 182 (1983).[6] Absolute immunity applies "to every step" of the proceedings "including situations in which voluntary action by the citizen is a preliminary to

---

[6] The absolute immunity for statements made in quasi-judicial proceedings has been applied to statements made in connection with "a wide array of hearings held by administrative agencies." *Allan and Allan Arts Ltd. v. Rosenblum*, 201 A.D.2d 136, 139, 615 N.Y.S.2d 410, 412 (1994).

25

a statutory proceeding," *id.*, and "irrespective of whether formal charges are ever presented,"

*Herzfeld & Stern, Inc. v. Beck*, 175 A.D.2d 689, 691, 572 N.Y.S.2d 683, 685 (1991); *see also*

*Weissman v. Mogol*, 118 Misc. 2d 911, 915, 462 N.Y.S.2d 383, 386 (Sup. Ct. Nassau Co. 1983)

("when voluntary action by [a] citizen is a preliminary to a statutory proceeding . . . the shield of

absolute privilege protects").

> Under New York law, absolute immunity
>
> protects communications irrespective of the communicant's motives. . . .  In
> general, its protective shield has been granted only to those individuals
> participating in a public function, such as judicial, legislative, or executive
> proceedings.  The absolute protection afforded such individuals is designed to
> ensure that their own personal interests—especially fear of civil action, whether
> successful or otherwise—do not have an adverse impact upon the discharge of
> their public function.

*Toker v. Pollak*, 44 N.Y.2d 211, 219, 376 N.E.2d 163, 166 (1978).  "The absolute privilege will

apply to any statement that may possibly or plausibly be relevant or pertinent, with the barest

rationality." *Joseph v. Larry Dorman, P.C.*, 177 A.D.2d 618, 619, 576 N.Y.S.2d 588, 589

(1991).

As with the "sham" exception to the *Noerr-Pennington* doctrine, however, the common

law absolute privilege for statements in official proceedings does not apply if the proceeding

itself was fraudulently instituted.  Under New York law, a statement made in a complaint that is

"unfounded, instituted with malice, and for the purpose of publicly disseminating libelous

statements . . . is barred neither by the absolute privilege afforded statements made in pleadings,

nor by the statutory privilege afforded fair and true reports of such statements." *Bridge C.A.T.*

*Scan Assoc. v. Murphy*, 608 F. Supp. 1187, 1194 (S.D.N.Y. 1985) (relying on *Williams v.*

*Williams*, 23 N.Y.2d 592, 246 N.E.2d 333 (1969)).[7]  As the *Bridge* court stated, the *Williams* decision, which addressed the statutory privilege for "fair and true reports" of official proceedings (discussed below), "renders the common law privilege afforded statements made during the course of judicial proceedings equally inapplicable." *Bridge*, 608 F. Supp. at 1194.

In the Underlying Complaint, ConsumerLab alleged that the Plaintiffs petitioned the FTC for action, and by doing so, and by making public statements about its petition, defamed ConsumerLab.  To demonstrate that the foreseeable assertion of the defense of absolute privilege afforded to statements made in judicial or quasi-judicial proceedings was inapplicable, ConsumerLab additionally had to allege, as it did, that the CRN Petition to the FTC was fraudulent, filed as a pretext for its subsequent defamatory media campaign, thereby eviscerating the absolute privilege.  It was therefore not legally possible for ConsumerLab to state a claim against the Plaintiffs on a lesser allegation of state of mind.

### c)    Section 74 of the New York Civil Rights Law

Section 74 of the New York Civil Rights Law provides that "[a] civil action cannot be maintained against any person, firm or corporation, for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding, or for any heading of the report which is a fair and true headnote of the statement published."  N.Y. Civ. Rights Law § 74 (Consol. 2006). [8]

Section 74 "extends to 'any person' whether or not he acts with malice." *Branca v. Mayesh*, 101 A.D.2d 872, 873, 476 N.Y.S.2d 187, 188 (1984); *see also Glendora v. Gannett*

---

[7] *See also Hoeppner v. Dunkirk Printing Co.*, 254 N.Y. 95, 106, 172 N.E. 139, 142 (1930) (complaint alleging common law malice stated a cause of action because "no comment or criticism, otherwise libelous, is fair or just comment on a matter of public interest if it be made through actual ill will and malice").

[8] Section 74 applies also to quasi-judicial proceedings. *See Leder v. Feldman*, 173 A.D.2d 317, 569 N.Y.S.2d 702 (1991) (Section 74 applied to case involving newsletters summarizing testimony and the decision of an ALJ in an administrative proceeding).

*Suburban Newspapers*, 201 A.D.2d 620, 620, 608 N.Y.S.2d 239, 240-41 (1994) ("[T]he privilege set forth in Civil Rights Law § 74 is absolute, and is not defeated by the presence of malice or bad faith"). The protections in Section 74 extend "not only to a transcript of the proceeding itself, but also to any pleading made within the course of the proceeding." *Id.* Assuming that the administrative action "was commenced for the legitimate purposes . . . a 'fair and true report' of the proceeding may be published by 'any person,' including those connected with the suit." *Branca*, 101 A.D.2d at 873, 476 N.Y.S.2d at 189; *Fishoff v. Abady*, 280 A.D.2d 417, 417-18, 720 N.Y.S.2d 505, 506 (2001) (Section 74 applies to a party's circulation of pleadings to media; "[t]he absolute privilege under [Section 74] also extends to the release of background material with regard to the case, so long as the statement is a substantially accurate description of the allegation").

As with the *Noerr-Pennington* doctrine and the common law absolute privilege for statements made in judicial and quasi-judicial proceedings, the absolute privilege afforded pursuant to Section 74 of the New York Civil Rights Law does not arise if the judicial proceeding itself is illegitimate. In *Williams v. Williams*, the New York Court of Appeals held that the absolute privilege afforded under Section 74 is inapplicable when a person "maliciously institute[s] a judicial proceeding alleging false and defamatory charges . . . then circulate[s] a press release or other communication based thereon . . . [to] escape liability by invoking the statute." *Williams*, 23 N.Y.2d at 599, 246 N.E.2d at 337. The Court of Appeals further stated that "it is impossible to conceive of the Legislature's intending to protect the defendant's perversion of judicial proceedings." *Id.*; *see also Weissman*, 118 Misc. 2d at 918-19, 462 N.Y.S.2d at 388 ("the absolute privilege afforded litigants in a lawsuit does not extend to parties

28

who maliciously institute a proceeding alleging false and defamatory charges and then publicize them in the press").

As discussed above, ConsumerLab clearly alleged in the Underlying Complaint that the Plaintiffs maliciously instituted the FTC proceeding as a pretext, in order to defame ConsumerLab. *See* Underlying Complaint ¶¶ 10-12, 57. This allegation of intent to injure was necessary to foreclose application of Section 74 of the Civil Rights Law, as otherwise the Plaintiffs' statements would be absolutely privileged. ConsumerLab could not possibly have alleged a claim against the Plaintiffs on a less-culpable state of mind.

### 2.    ConsumerLab Could Not Successfully Allege Defamation or Disparagement Without Also Alleging Intent to Injure

As the foregoing discussion makes clear, this case is fundamentally different from *Pooya*. Here, the facts surrounding the CRN Petition and related public comments gave rise to the applicability of at least three privileges to liability under New York law. The only way ConsumerLab could state a claim that would bar assertion of those privileges was to allege, specifically, that CRN maliciously or illegitimately instituted the FTC proceeding itself as a sham or a pretext, in order to defame and injure ConsumerLab. Over and over, ConsumerLab alleged exactly that. Therefore, based on the applicable law, it was a legal impossibility for ConsumerLab to recover on a showing of a less-culpable state of mind on the part of the Plaintiffs, putting the Underlying Complaint squarely within Hartford's exclusion, even under *Pooya*.

## IV.    CONCLUSION

WHEREFORE, for all the foregoing reasons, Defendant Hartford Casualty Insurance Company respectfully requests that this Court grant summary judgment declaring that it had no duty to defend the Underlying Suit and entering judgment in favor of Hartford on all counts of

the Complaint, and award Hartford its costs, expenses, and attorney fees incurred in this litigation.

DATED this 23rd day of February 2007.

Respectfully submitted,

TROUTMAN SANDERS LLP

__/s/ Patrick F. Hofer_____
Patrick F. Hofer, Bar No. 412665
Tracy P. Varghese, Bar No. 472805
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 274-2950 (tel.)

*Counsel for Defendant Hartford Casualty Insurance Company*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNCIL FOR RESPONSIBLE
NUTRITION and
ANNETTE DICKINSON,

          Plaintiffs,

     v.

HARTFORD CASUALTY INSURANCE
COMPANY,

          Defendant.

Case No.: 1:06-CV-01590-RMC

## STATEMENT OF MATERIAL FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE

Pursuant to Local Rules 7(h) and 56.1, Defendant Hartford Casualty Insurance Company ("Hartford") respectfully submits the following statement of material facts as to which there is no genuine issue to be tried.

### The Parties

1.       Council For Responsible Nutrition ("CRN") is a trade association representing ingredient suppliers and manufacturers in the dietary supplement industry. Council for Responsible Nutrition, About CRN, http://www.crnusa.org/who_about.html (last visited Feb. 14, 2007). CRN was and is a non-profit corporation formed and existing by virtue of the laws of the District of Columbia with its principal place of business in the District of Columbia. Complaint ¶ 2.[1]

---

[1] The unmodified term "Complaint" as used herein means the complaint filed in this case by Plaintiffs. The term "Underlying Complaint" refers to the complaint filed by ConsumerLab against Plaintiffs in New York state court, for which Plaintiffs seek coverage.

2.    Annette Dickinson, the president of CRN at the time the events at issue took place, was a citizen and resident of Mount Airy, Maryland, and currently resides in Minnesota. *Id.* ¶ 3.

3.    Hartford was and is an Indiana corporation with its principal place of business in Hartford, Connecticut.  *Id.* ¶ 4.  At all times relevant hereto, Hartford was licensed to conduct business in the District of Columbia.  *Id.*

**The Underlying Suit**

4.    On April 5, 2005, ConsumerLab filed the Underlying Suit against CRN and Dickinson in the Supreme Court of New York, County of Westchester.  Verified Complaint, *ConsumerLab.com, LLC v. Council for Responsible Nutrition, et al.*, Index No. 05-04998 (N.Y. Sup. Ct. Westchester Co.) ("Underlying Complaint") (attached as Exhibit 2 to the Declaration of Patrick F. Hofer in Support of Hartford's Motion for Summary Judgment ("Hofer Decl."), submitted herewith).

5.    The Underlying Complaint alleges that on January 12, 2005, CRN filed a petition or a request for an investigation ("CRN Petition") with the U.S. Federal Trade Commission ("FTC"), requesting that an enforcement action be brought against ConsumerLab because it had engaged in "unfair business practices." *Id.* ¶ 15.

6.    According to the Underlying Complaint, the CRN Petition alleged that ConsumerLab engaged in a deceptive scheme whereby it "requires supplement manufacturers to pay a fee to obtain favorable publicity for positive test results or to avoid unfavorable publicity for negative test results." *Id.*  ConsumerLab also alleged that the CRN Petition charged that, while the fee-paying manufacturers enjoyed the benefit of having their positive test results publicized on ConsumerLab's website, manufacturers who refused to accede to the scheme

2

suffered because, even if their test results were positive, they received no publicity and their products were omitted from the list of passing products. *Id.*

7.    ConsumerLab also alleged that the CRN Petition asserted that "ConsumerLab's deceptive acts violate the FTC Act" in two ways: "First, ConsumerLab misleads the public by failing to provide material information and by advertising itself as independent of the product manufacturers;" and "[s]econd, ConsumerLab deceives consumers into believing that ConsumerLab itself conducts product testing." *Id.*

8.    The CRN Petition concluded that ConsumerLab's "entire business model represents and [sic] egregious form of consumer fraud and deception" and urged "prompt investigation and swift enforcement to curtail ConsumerLab's unfair business practices." *Id.*

9.    ConsumerLab alleged that CRN posted a copy of the CRN Petition on its website. *Id.* ¶ 9.

10.    ConsumerLab alleged that CRN also posted a defamatory press release on its website and on a public newswire, which cited to the Internet address of the CRN Petition on CRN's website. *Id.* ¶¶ 16-17.

11.    The Underlying Complaint also alleged that CRN furnished advance copies of the CRN Petition to certain media outlets, including the Wall Street Journal, which published an article about the CRN Petition and its allegations. *Id.* ¶ 12.

12.    ConsumerLab alleged that CRN's "membership consists of suppliers and manufacturers of vitamins and dietary supplements and also includes two associate members which are competitors of" ConsumerLab. *Id.* ¶ 2.

13.    The Underlying Complaint asserted a number of causes of action, including defamation, injurious falsehoods, trade libel, infliction of intentional harm and tortious interference with contractual relationships.

14.    ConsumerLab alleged that Plaintiffs "published statements" regarding ConsumerLab "with the intent of causing harm to" ConsumerLab. *Id.* ¶ 52.

15.    Further, as part of the "Factual Background" incorporated into every count asserted in the Underlying Complaint, ConsumerLab alleged the following:

>    a.    "[Plaintiffs] used the existence of the CRN Complaint for a broad-
>        based media campaign, which included press releases, and which *was*
>        *intended to, and did, defame* [ConsumerLab] and cause damages to
>        [ConsumerLab's] business income and business reputation." *Id.* ¶10
>        (emphasis added).
>
>    b.    "The CRN Complaint *was not intended as a truthful and legitimate*
>        *complaint* of claimed violations of the statues and regulations for
>        which the FTC is an enforcement agency *but, instead, was a pretext to*
>        *purposefully and maliciously initiate and conduct a widespread*
>        *defamatory media campaign* against [ConsumerLab]. To whatever
>        extent [Plaintiffs'] filing might otherwise have been subject to a
>        qualified privilege, that privilege has been overcome, waived and
>        nullified." *Id.* ¶ 11 (emphasis added).
>
>    c.    "Prior to the acceptance by the FTC of the filing of the CRN
>        Complaint, [Plaintiffs] furnished advance copies of the CRN
>        Complaint to certain news reporters, including a reporter for the Wall

Street Journal which published an article about the CRN Complaint in the January 13th edition of the Wall Street Journal." *Id.* ¶ 12.

d.  "*[A] principal purpose of [Plaintiffs'] defamatory media campaign against [ConsumerLab] was to silence [ConsumerLab]* and thereby cut off the flow of legitimate consumer information published by [ConsumerLab] in a misguided effort that by doing so [CRN] would be shielding CRN's members from any adverse findings in [ConsumerLab's] *bona fide* test results of products manufactured and distributed by CRN's members." *Id.* ¶ 13 (emphasis added).

e.  "The charges which you [*i.e.*, CRN] filed against [ConsumerLab] with the FTC . . . had as their essential purpose, to silence [ConsumerLab] and wreak vengeance upon [ConsumerLab] for disclosing the failings of some of your industry and, perhaps, benefit certain of CRN's associate members which are competitors of [ConsumerLab]  We also believe that a Court will find that your [i.e., CRN's] actions, and especially the simultaneous wide dissemination of the charges, were unlawful and defamatory and *were maliciously designed to undermine [ConsumerLab] and its business.*" *Id.* ¶ 22 (emphasis added).

16.    CRN and Dickinson filed a motion to dismiss the Underlying Suit Complaint for failure to state a claim.  Complaint ¶ 23.

17.    On or about May 16, 2006, the court in the Underlying Suit dismissed all the counts in the Underlying Complaint, except for one.  *Id.* ¶ 23.

18.    CRN has since advised Hartford that the Underlying Suit has been settled and dismissed.  Hofer Decl. ¶ 6.

**The Hartford Policy**

19.    Hartford issued a commercial business insurance policy to CRN numbered 42 SBA FT4964, which covered the policy period April 1, 2004, to April 1, 2005.  Complaint ¶ 7 (the Policy is attached as Exhibit 1 to the Hofer Declaration).

20.    Pursuant to the Policy's Business Liability Insurance Coverage Form, the Policy provided coverage for certain liability the insureds may have to third parties, as specified in the Policy .  Policy at HART000049-70.

21.    In pertinent part, the Policy provides:

A.    **COVERAGES**

1.    **BUSINESS LIABILITY COVERAGE (BODILY INJURY, PROPERTY DAMAGE, PERSONAL AND ADVERTISING INJURY)**

**Insuring Agreement**

a.    We will pay on behalf of the insured those sums that the insured becomes legally obligated to pay as damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend the insured against any "suit" seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury", "property damage" or "personal and advertising injury" to which this insurance does not apply.

*Id.* at HART000051; *see also* Complaint ¶ 10.

22.    "Personal and advertising injury" is defined in the Policy as follows:

"Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:
                    *        *        *
d.    Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

6

Policy at HART000069; *see also* Complaint at ¶ 11.

    23.    The Policy contains the following exclusion:

**B.    EXCLUSIONS**

    **1.    Applicable to Business Liability Coverage**

    This insurance does not apply to:

    **a.    Expected or Intended Injury**

    *      *      *

    **(2)** "Personal and advertising injury" arising out of an offense committed by, at the direction of or with the consent or acquiescence of the insured with the expectation of inflicting "personal and advertising injury".

Policy at HART000054.

**<u>The Coverage Dispute</u>**

    24.    In April of 2005, Plaintiffs tendered the Underlying Complaint to Hartford. Complaint ¶ 31.

    25.    On or about April 29, 2005, Hartford disclaimed any duty to defend or indemnify Plaintiffs with regard to the Underlying Complaint, citing Exclusion 1.a.(2) of the Policy. *Id.* ¶ 31.

    26.    Counsel for both parties discussed the disputed issue of Hartford's duty to defend via letter, but neither party's position changed. *Id.* ¶¶ 36-40.

    27.    On September 13, 2006, Plaintiffs filed the Complaint in this case. *Id.* ¶ 1.

DATED this 23rd day of February 2006.

Respectfully submitted,

TROUTMAN SANDERS LLP


__/s/ Patrick F. Hofer_____
Patrick F. Hofer, Bar No. 412665
Tracy P. Varghese, Bar No. 472805
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 274-2950 (tel.)

*Counsel for Defendant Hartford Casualty Insurance Company*

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of February 2007, I caused a copy of Defendant

Harford Casualty Insurance Company's Motion for Summary Judgment, the Memorandum of

Points and Authorities In Support, the Declaration of Patrick F. Hofer, the Statement of Material

Facts As To Which There Is No Issue, and Proposed Order to be served upon all counsel of

record via ECF and electronic mail as set forth below:

Janet K. Coleman
WHITNEY & BOGRIS, LLP
401 Washington Avenue
Towson, Maryland 21204
(410) 583-8000 (tel.)


  /s/ Tracy P. Varghese
Tracy P. Varghese