UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COUNCIL FOR RESPONSIBLE NUTRITION and ANNETTE DICKINSON,<br><br>        Plaintiffs,<br><br>    v.<br><br>HARTFORD CASUALTY INSURANCE COMPANY,<br><br>        Defendant. | Case No.: 1:06-CV-01590-RMC |

## DEFENDANT HARTFORD CASUALTY INSURANCE COMPANY'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7 and 56.1, Defendant Hartford Casualty Insurance Company ("Hartford"), through undersigned counsel, hereby opposes Plaintiffs' Motion for Partial Summary Judgment. The grounds supporting this Opposition are fully set forth in the accompanying Memorandum of Points and Authorities.

This Opposition is also supported by Hartford's Counterstatement of Material Facts and the accompanying Declaration of Patrick F. Hofer. Hartford's proposed order was submitted with its Motion for Summary Judgment.

WHEREFORE, Hartford respectfully requests that this Court deny Plaintiffs' Motion for Partial Summary Judgment, grant its Motion for Summary Judgment, and enter judgment in favor of Hartford for the reasons given in its Memoranda of Points and Authorities.

DATED this 26th day of March, 2007.

Respectfully submitted,


　　/s/ Patrick F. Hofer　　　　　　
Patrick F. Hofer, Bar No. 412665
Tracy P. Varghese, Bar No. 472805
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 274-2950 (tel.)

*Counsel for Hartford Casualty Insurance Co.*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COUNCIL FOR RESPONSIBLE NUTRITION and ANNETTE DICKINSON, <br><br> Plaintiffs, <br><br> v. <br><br> HARTFORD CASUALTY INSURANCE COMPANY, <br><br> Defendant. | Case No.: 1:06-CV-01590-RMC |

**DEFENDANT HARTFORD CASUALTY INSURANCE COMPANY'S
MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT**

TROUTMAN SANDERS LLP
Patrick F. Hofer, Bar No. 412665
Tracy P. Varghese, Bar No. 472805
401 9th Street, NW, Suite 1000
Washington, D.C. 20004-2134
(202) 274-2950

*Counsel for Defendant Hartford
Casualty Insurance Company*

Dated:  March 26, 2007

## TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   ARGUMENT.......................................................................................................3

    A.   Injury to ConsumerLab's Reputation was the Natural and Probable
        Consequence of Plaintiffs' Alleged Actions in Filing and Publicizing the CRN
        Petition.............................................................................................................3

    B.   Plaintiffs Ignore the Fact that It Was Legally Impossible for ConsumerLab to
        Recover Without Alleging Intent to Injure ....................................................4

    C.   Plaintiffs' Attempts to Evade the Policy Language and D.C. Law Are Without
        Merit ................................................................................................................8

        1.   Hartford's Policy Language Is Not Ambiguous, Nor Does It Result in
            Illusory Coverage .................................................................................8

        2.   The "Eight-Corners Rule" Indisputably Governs this Case .................13

        3.   Because the "Eight-Corners Rule" Is Settled Law in D.C., an *Erie*
            Prediction" Is Unnecessary and Improper...........................................16

    D.   Examination of Extrinsic Evidence Does Not Affect the Result; Coverage
        Would Still Be Excluded Under the Hartford Policy ....................................19

        1.   Plaintiffs' Reliance on the Underlying Court's Use of the Term "Actual
            Malice" Is Unavailing ........................................................................19

        2.   ConsumerLab Continues to Allege that the Plaintiffs' Conduct Was a
            Sham.....................................................................................................21

III.  CONCLUSION...................................................................................................23

## TABLE OF AUTHORITIES

### FEDERAL CASES

*American Registry of Pathology v. Ohio Casualty Insurance Co.*, 461 F. Supp. 2d 61
   (D.D.C. 2006) ..........................................................................................................15, 16

*Bridge C.A.T. Scan Associates v. Ohio-Nuclear, Inc.*, 608 F. Supp. 1187 (S.D.N.Y. 1985)...........6

*Cellwave Telegraph Services L.P. v. FCC*, 30 F.3d 1533 (D.C. Cir. 1994) ...................................17

*Commissioner v. Estate of Bosch*, 387 U.S. 456 (1967) ..................................................................17

*Costello Publishing Co. v. Rotelle*, 670 F.2d 1035 (D.C. Cir. 1981).............................................12

*Davis v. The Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001) ....................................................................12

*Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).......................................................................16

*Fuisz v. Selective Insurance Co.*, 61 F.3d 238 (4th Cir. 1995) .........................................7, 8, 9, 10

*Nationwide Mutual Insurance Co. v. Richardson*, 270 F.3d 948 (D.C. Cir. 2001) ......................17

*Puritan Insurance Co. v. 1330 Nineteenth Street Corp.*, Nos. 83-2228 and 83-1754,
   1984 U.S. Dist. LEXIS 18477 (D.D.C. Mar. 19, 1984)........................................................3

*Tidler v. Eli Lilly & Co.*, 851 F.2d 418 (D.C. Cir. 1988)..........................................................17, 18

*Vandenbark v. Owens-Ill. Glass Co.*, 311 U.S. 538 (1941)............................................................16

*Women Prisoners of the D.C. Department of Corrections v. District of Columbia*,
   93 F.3d 910 (D.C. Cir. 1996)..............................................................................................17

### STATE CASES

*Alfred Weissman Real Estate, Inc. v. Big V Supermarkets, Inc.*, 268 A.D.2d 101, 707
   N.Y.S.2d 647 (2000)..............................................................................................................6

*American Cont'l Insurance Co. v. Pooya*, 666 A.2d 1193 (D.C. 1995) ...........................................7

*Broughton v. State*, 37 N.Y.2d 451, 335 N.E.2d 310 (1975)..............................................10, 11, 12

*Byrd v. Nationwide Mutual Insurance Co.*, 415 A.2d 807 (D.C. 1980) ...........................................3

*Drinkhouse v. Parka Corp.*, 3 N.Y.2d 82, 143 N.E.2d 767 (1957) ................................................11

*Friedman v. Ergain*, 110 A.D.2d 620, 487 N.Y.S.2d 109 (1985), *aff'd*, 66 N.Y.2d 645, 485 N.E.2d 1029 (1985)..................................................................................20

*Glass v. Wiener*, 92 A.D.2d 584, 459 N.Y.S.2d 471 (1983).........................................11

*I.J.G., Inc. v. Penn-America Ins. Co.*, 803 A.2d 430 (D.C. 2002)...................................15

*Liberman v. Gelstein*, 80 N.Y.2d 429, 605 N.E.2d 344 (1992)................................20, 21

*Moore v. Manufacturers' National Bank of Troy*, 123 N.Y. 420, 25 N.E. 1048 (1890).................6

*Morsette v. The Final Call*, 309 A.D.2d 249, 764 N.Y.S.2d 416 (2003)........................20

*Nardelli v. Stamberg*, 44 N.Y.2d 500, 377 N.E.2d 975 (1978) ........................................12

*Park Knoll Associates v. Schmidt*, 89 A.D.2d 164, 454 N.Y.S.2d 901 (1982), *rev'd on other grounds*, 59 N.Y.2d 205, 451 N.E.2d 182 (1983) .................................................6, 13

*Quinn v. McCochrane*, 210 A.D. 569, 206 N.Y.S. 550 (1924) .......................................11

*Stevens v. United General Title Insurance Co.*, 801 A.2d 61 (D.C. 2002).....................14, 15

*Toker v. Pollak*, 44 N.Y.2d 211, 376 N.E.2d 163 (1978) ..................................................6

*Travelers Indemnity Co. v. United Food & Commercial Workers International Union*, 770 A.2d 978 (D.C. 2001) ...........................................................................................9, 14

*Zaidi v. United Bank Ltd.*, 194 Misc. 2d 1, 747 N.Y.S.2d 268 (Sup. Ct. New York Co. 2002) ....................................................................................................................20, 21

## MISCELLANEOUS

4-13 *Nimmer on Copyright* § 13-01 (2006) .........................................................11, 12

Fowler V. Harper, Fleming James, Jr., & Oscar S. Gray, *Harper, James and Gray on Torts* (3d ed. 2006)..........................................................................10, 11, 12, 13

17A James Wm. Moore, *et al.*, *Moore's Federal Practice* ¶ 124.22[3] (3d ed. 2006) ...........17, 18

W. Page Keeton *et al.*, *Prosser and Keeton on The Law of Torts* (5th ed. 1984)....................10, 12

Restatement (Second) of Torts § 676 cmt. c (1977) .....................................................12

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COUNCIL FOR RESPONSIBLE
NUTRITION and
ANNETTE DICKINSON,

        Plaintiffs,

        v.

HARTFORD CASUALTY INSURANCE
COMPANY,

        Defendant.

Case No.: 1:06-CV-01590-RMC

### DEFENDANT HARTFORD CASUALTY INSURANCE COMPANY'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Hartford Casualty Insurance Company ("Hartford"), by counsel, respectfully submits this memorandum of points and authorities in opposition to Plaintiffs Council for Responsible Nutrition's ("CRN") and Annette Dickinson's Motion for Partial Summary Judgment.

## I.    INTRODUCTION

CRN and Dickinson argue that Hartford was obliged to defend the suit brought against them by ConsumerLab.com, LLC ("ConsumerLab") because, even though the ConsumerLab complaint (the "Underlying Complaint") is replete with allegations that CRN and Dickinson intended to harm ConsumerLab, CRN and Dickinson "could have" been held liable for defaming ConsumerLab (or disparaging its products) upon a showing of mere "reckless disregard" for the truth or a showing that Plaintiffs acted "without due consideration for the standards . . . ordinarily followed by responsible parties," and therefore could have been liable for libel,

slander or disparagement *without* a showing that they committed those offenses "with the expectation of inflicting 'personal and advertising injury.' " Plaintiffs make that argument while wholly failing to discuss or analyze the New York law that actually applied to the claims ConsumerLab asserted against them, including what state of mind was required under the torts alleged. As thoroughly laid out in Hartford's opening brief on these cross-motions, however, under New York law ConsumerLab had to allege, as it did, with respect to *all* of its claims, that Plaintiffs filed the petition with the Federal Trade Commission (the "CRN Petition") illegitimately and as pretext, with intent to harm ConsumerLab, in order to preclude application of absolute privileges to liability. It was therefore legally impossible for ConsumerLab to recover without alleging and proving that intent. Accordingly, the Underlying Complaint clearly alleged " 'personal and advertising injury' arising out of an offense committed by the insured with the expectation of inflicting" that injury, which was excluded from coverage under the Hartford Policy.

Perhaps sensing the weakness of their position, Plaintiffs offer two fallback arguments in an attempt to evade the necessary conclusion that, under the terms of Hartford's Policy and D.C. law, Hartford had no duty to defend. First, Plaintiffs ask the Court to rewrite the Policy to excise the "expected injury" exclusion from the Policy altogether. Second, Plaintiffs ask the Court, as a federal court sitting in diversity, to ignore the *Erie* doctrine and controlling caselaw from D.C.'s highest court on the standard of the duty to defend (called the "eight corners" rule), in order to establish a new rule more to Plaintiffs' liking. The Court should decline both invitations. With respect to Plaintiffs' suggestion that the "expected injury" exclusion should be deleted, the Court has no power to rewrite a contract, and, in any event, the exclusion does not result in "illusory" coverage, but rather carries out the parties' basic contractual intent (and furthers public policy)

by foreclosing insurance coverage for injury expected or intended by the insured.  With respect

to the suggestion that the Court ignore D.C. case law on the "eight corners" rule, Plaintiffs

misconstrue applicable law on when an *Erie* prediction is permissible: simply stated, where the

jurisdiction's highest court has already spoken on an issue, not only is an *Erie* prediction not

needed, but a "prediction" *contrary* to that ruling violates *Erie* itself.  Yet even if the Court were

to consider the proffered extrinsic evidence of Plaintiffs' intent, none of that evidence changes

the fundamental truth that ConsumerLab could not succeed on its claims without alleging and

showing that Plaintiffs intended to injure it, leaving the result for Hartford's duty to defend no

different.

    As a result, the Court should deny Plaintiffs' motion for partial summary judgment and

grant Hartford's cross-motion.

## II.    ARGUMENT

### A.    Injury to ConsumerLab's Reputation was the Natural and Probable Consequence of Plaintiffs' Alleged Actions in Filing and Publicizing the CRN Petition

    Hartford's opening brief demonstrated that, under D.C. law, "expected injury" is injury

that is the natural and probable consequence of an insured's acts, reasonably foreseeable either

by the insured or a reasonable person in the insured's position.  Defendant Hartford Casualty

Insurance Company's Memorandum of Points and Authorities in Support of its Motion for

Summary Judgment ("Hartford Op. Br.") at 13-17.  *See Byrd v. Nationwide Mut. Ins. Co.*, 415

A.2d 807, 809 (D.C. 1980); *Puritan Ins. Co. v. 1330 Nineteenth Street Corp.*, Nos. 83-2228 and

83-1754, 1984 U.S. Dist. LEXIS 18477, at *7 (D.D.C. Mar. 19, 1984).

    In this case, the natural and probable consequences of the Plaintiffs' alleged conduct,

submitting the CRN Petition to the FTC, was to inflict injury on ConsumerLab in the form of

harm to its reputation and disparagement of its business. The Underlying Complaint alleges that the Plaintiffs intentionally filed the CRN Petition with the FTC, posted a copy of the CRN Petition on their website, and issued a press release. The express purpose in filing the CRN Petition was to instigate an FTC enforcement action against ConsumerLab's allegedly unfair and deceptive practices. Therefore, CRN's statements, as alleged in the Underlying Complaint, accused ConsumerLab of extensive wrongdoing, including fraud, deception, unfair trade practices, and misrepresenting its services. *See, e.g.*, CRN Petition at 7 ("This entire business model represents an egregious form of consumer fraud and deception."). Moreover, Plaintiffs were alleged to have actively publicized these charges on their website and in at least one newspaper. The sole conclusion that logically can be drawn is that the injury alleged to ConsumerLab's reputation was the natural and probable consequence of Plaintiffs' acts of filing and publicizing the CRN Petition. That alleged injury was, without question, reasonably foreseeable to CRN, or to a reasonable person in its position.

Moreover, the Underlying Complaint is replete with allegations that Plaintiffs not only expected to injure ConsumerLab, but expressly intended to do so. *See, e.g.*, Underlying Complaint ¶ 10 ("[Plaintiffs] used the existence of the CRN Complaint for a broad-based media campaign, which included press releases, and which *was intended to, and did, defame* [ConsumerLab].") (emphasis added). The Underlying Complaint therefore clearly alleges that Plaintiffs expected or intended to injure ConsumerLab's reputation.

**B.    Plaintiffs Ignore the Fact that It Was Legally Impossible for ConsumerLab to Recover Without Alleging Intent to Injure**

In the face of the clear conclusion that the Underlying Complaint alleged that Plaintiffs acted with the expectation of inflicting injury, Plaintiffs rely on the argument that ConsumerLab made "alternative allegations" that Plaintiffs made defamatory statements with "reckless

4

disregard of whether or not such statements were false," "in a grossly irresponsible manner," and "without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties," and that these "alternative allegations" created the potential for a covered claim. Memorandum of Points and Authority in Support of Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Op. Br.") at 12. Plaintiffs' reliance on these allegations is misplaced. Contrary to Plaintiffs' assertion, these are not "alternative allegations," which could support a claim independent of whether intent to injure was also pleaded, but are legally irrelevant and immaterial, because ConsumerLab could not state a claim without alleging intent to injure under New York law. They are therefore irrelevant to the issue of whether Hartford had a duty to defend.

Under New York law, which ConsumerLab alleged applied to the Underlying Suit, ConsumerLab faced three hurdles to assertion of its defamation claim: (1) the absolute privilege under the *Noerr-Pennington* doctrine, which generally shields from civil liability those who seek to petition the government; (2) the common law absolute privilege for statements made in judicial or quasi-judicial proceedings; and (3) the absolute privilege under Section 74 of the New York Civil Rights Law, which protects from liability "fair and true reports" of judicial proceedings.

These privileges are "absolute" because they apply even where the defendant bore malice toward the plaintiff. Under New York law, the absolute privilege is "a veritable immunity, is impervious to proof, and therefore to a charge, of malice." *Park Knoll Assoc. v. Schmidt*, 89 A.D.2d 164, 168, 454 N.Y.S.2d 901, 904 (1982), *rev'd on other grounds,* 59 N.Y.2d 205, 451 N.E.2d 182 (1983); *Toker v. Pollak*, 44 N.Y.2d 211, 219, 376 N.E.2d 163, 166 (1978) (absolute immunity "protects communications irrespective of the communicant's motives."). "In questions

falling within the absolute privilege the question of malice has no place.  However malicious the intent, or however false the charge may have been, the law . . . denies to the defamed party any remedy through an action for libel or slander." *Moore v. Manufacturers' Nat'l Bank of Troy*, 123 N.Y. 420, 426, 25 N.E. 1048, 1049 (1890).

Though these privileges apply even where the defendant acted with malice, they *never arise* if the defendant initiated the relevant proceeding (a petition, a court case or other proceeding) illegitimately and as a pretext, in order to injure the plaintiff.  *See* Hartford Op. Br. at 21-29.  The absolute privilege afforded by the *Noerr-Pennington* doctrine does not arise if the governmental petition was a "sham."  *See Alfred Weissman Real Estate, Inc. v. Big V Supermarkets Inc.*, 268 A.D.2d 101, 109, 707 N.Y.S.2d 647, 654 (2000).  Similarly, the common law absolute privilege for statements in judicial and quasi-judicial proceedings, and the absolute privilege afforded pursuant to Section 74 of the New York Civil Rights Law do not arise if the judicial proceeding itself was fraudulently instituted.  *See Bridge C.A.T. Scan Assoc. v. Ohio-Nuclear, Inc.*, 608 F. Supp. 1187, 1194 (S.D.N.Y. 1985) (relying on *Williams v. Williams*, 23 N.Y.2d 592, 246 N.E.2d 333 (1969)).

Thus, the only way ConsumerLab could state a claim that would foreclose these absolute privileges was to allege specifically that the Plaintiffs submitted the CRN Petition to the FTC illegitimately and as a pretext or sham, in order to injure ConsumerLab through a defamatory media campaign.  The Underlying Complaint makes precisely those allegations, as Hartford demonstrated in its opening brief.  Hartford Op. Br. at 21-25.  As a result, ConsumerLab's additional inclusion of allegations of "reckless disregard," "without due consideration," etc., are irrelevant: Alone, they could not support a claim against the Plaintiffs, and ConsumerLab had to allege that the CRN Petition was filed illegitimately and as a sham to injure ConsumerLab, in

order for ConsumerLab to foreclose the application of the absolute privilege. ConsumerLab could not possibly have alleged a claim against the Plaintiffs on a less-culpable state of mind.

In light of this conclusion, the decisions in *American Cont'l Ins. Co. v. Pooya*, 666 A.2d 1193 (D.C. 1995), and *Fuisz v. Selective Ins. Co.*, 61 F.3d 238 (4th Cir. 1995), relied upon by Plaintiffs, do not support their position here. In *Pooya*, the court held, based on the policy language before it, that if an insured's conduct in defaming a third party "was reckless, and not malicious, knowing or wilful, his actions would be covered." 666 A.2d at 1199. While *Pooya* found that "it was possible" that the insured "could be liable for defamation without intentional acts being proven," *id.* at 1199, in this case it was legally impossible for the Plaintiffs to be found liable without the allegation and proof of intent to injure, because ConsumerLab had to allege and prove intent to injure to foreclose applicable privileges.[1]

The decision in *Fuisz* actually supports Hartford's position here. There, the Fourth Circuit, applying Virginia law, held that if a complaint alleges in the alternative that the defendant "acted with recklessness and actual malice, there is a *significant possibility*" that the insured would "ultimately be held liable for defamation based on a lesser standard of culpability than common-law malice," *Fuisz*, 61 F.3d at 245 (emphasis added), and therefore the insured's actions would be covered under the policy despite the exclusion for "any act committed by or at the direction of an insured *with intent to cause* . . . personal injury." *Id.* at 243-44. But the

---

[1] The policy in *Pooya* covered only "an accident, error or omission neither expected nor intended by the insured which results in injury." 666 A.2d at 1194. This language may be distinguished from the exclusion in the Hartford Policy here. In *Pooya*, the "accident, error or omission" had to be neither expected nor intended by the insured to be covered, rather than the resulting injury. Here, the exclusion excludes "personal and advertising injury" arising out of an offense committed by the insured "with the expectation of inflicting" that injury. Thus, the relevant state of mind of the insured in *Pooya* was with respect to expecting or intending the *insured's conduct*, whereas the relevant state of mind here is with respect to expecting the *inflicted injury*. Since *Pooya* does not consider the state of mind relevant here, its conclusion that alleged "reckless" conduct would bring a complaint within coverage arguably does not apply. Instead, the normal rules for determining when an insured "expected" injury—*i.e.*, the insured committed an act whose natural and probable consequences were injury, reasonably foreseeable by it or a responsible person in its position—ought to apply. In any event, the fact that ConsumerLab necessarily alleged intent to injure, with respect to all of its claims, means that even the standard of *Pooya* is met here.

decision also recognized that if the underlying complaint alleged only common-law malice, or intent to injure, no coverage would be afforded. *Id.* at 243. In this case, there was *no* possibility that Plaintiffs could be held liable for defamation or disparagement absent allegation and proof of intent to injure. Under *Fuisz*, therefore, Hartford's Policy affords no coverage.

In sum, the injury ConsumerLab alleged in the Underlying Complaint clearly was alleged to arise out of an offense "committed by [Plaintiffs] with the expectation of inflicting" that injury. Consequently, the expected injury exclusion of the Policy clearly applies, and Hartford had no duty to defend.

**C.     Plaintiffs' Attempts to Evade the Policy Language and D.C. Law Are Without Merit**

**1.     Hartford's Policy Language Is Not Ambiguous, Nor Does It Result in Illusory Coverage**

Perhaps recognizing the futility of arguing that the language of the Hartford Policy and applicable law support their position, Plaintiffs ask the Court to rewrite both. First, Plaintiffs argue that the Policy is ambiguous, and the ambiguity must be resolved in favor of coverage. To support their claim that the Policy is ambiguous, Plaintiffs mischaracterize the exclusion at issue as an "intentional torts" exclusion, which effectively operates to bar all of the "intentional torts" that the policy promises to cover. Plaintiffs' Op. Br. at 17. Plaintiffs misinterpret the language of the Hartford Policy in an attempt to demonstrate that there is ambiguity, when, in reality, no ambiguity exists. The language of the Hartford Policy is quite clear as to what torts are covered and what injuries are excluded. Plaintiffs simply disagree with the clear import of the Policy's language; but a mere disagreement in the meaning of a contract provision does not create an ambiguity. *Travelers Indem. Co. v. United Food & Commercial Workers Int'l Union*, 770 A.2d 978, 986 (D.C. 2001) (quoting *Byrd v. Allstate Ins. Co.*, 622 A.2d 691, 694 (D.C. 1993)) ("An

8

insurance contract is not 'ambiguous merely because the parties do not agree on the interpretation of the contract provision in question.' ").

The Hartford Policy exclusion is not an "intentional torts" exclusion. The exclusion excludes from coverage injuries that the insured expected to inflict. Thus, where an insured is charged with committing one of the enumerated torts, but not with expecting to inflict the injury at issue, the exclusion does not apply and (assuming other terms and conditions are satisfied) coverage is afforded. The policy language results in no ambiguity and does not provide illusory coverage.

In *Fuisz*, the Fourth Circuit agreed with this conclusion on similar facts. In that case, the policy at issue had an intentional injury exclusion, which eliminated coverage for " 'any act committed by or at the direction of an insured with intent to cause . . . personal injury. . . .' " *Fuisz*, 61 F.3d at 242. The policy also "specifically provide[d] coverage for injuries arising from defamation." *Id.* The Fourth Circuit noted that "while excluding coverage for any act by the insured done with 'intent to cause . . . personal injury,' at the same time the policies provide the insured coverage for 'personal injury,' including 'injury arising out of . . . libel, slander or defamation of character. . . .' " *Id.* The Fourth Circuit opined that while "[a]t first glance," the insurance "coverage of personal injuries arising out of defamation and its exclusion for acts intended to cause personal injury appear to be in direct conflict," the court did not find the policy to be ambiguous or the coverage illusory. *Id.* at 242-43. Rather, the court found that "the most reasonable interpretation of this clause" was the one the insurance company espoused: that "coverage for injuries arising from defamation claims is excluded when the insured *intends to cause that injury.*" *Id.* at 243 (emphasis added).

Like the insurance company in *Fuisz*, Hartford does not claim that the Policy at issue excludes coverage for injuries arising from all defamation claims. Rather, Hartford maintains that the expected injury exclusion must be read to exclude coverage of claims for injury arising out of defamation when the insured is alleged to have expected to inflict injury to reputation, an interpretation that has been expressly sanctioned by the Fourth Circuit in *Fuisz*.

At the same time, the torts covered under the "personal and advertising injury" coverage generally do not require proof that the insured expected to inflict injury to be actionable. Those torts include false arrest, detention or imprisonment; wrongful entry or eviction; copyright infringement; malicious prosecution; and defamation. Hartford Op. Br., Hofer Decl. Exh. 1 at HART00069.

**False Arrest or Imprisonment:** The tort of false imprisonment, also referred to as false arrest, protects an individual's "interest in freedom from confinement." 1 Fowler V. Harper, Fleming James, Jr., & Oscar S. Gray, *Harper, James and Gray on Torts* § 3.6 at 327 (3d ed. 2006) ("Harper & James"). To establish a cause of action for false imprisonment, "the plaintiff must show that: (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Broughton v. State*, 37 N.Y.2d 451, 456, 335 N.E.2d 310, 314 (1975) (relying on Restatement (Second) of Torts § 35 (1965)). "[T]he defendant's motives are immaterial to the question of liability. A valid arrest will not be rendered unlawful by malicious motives, nor will good faith rectify an otherwise unlawful arrest." *Id.* at 458-59, 335 N.E.2d at 315 (citations omitted).[2]

---

[2] "Although intent is necessary, malice, in the sense of ill will or a *desire to injure, is not*." W. Page Keeton *et al.*, *Prosser and Keeton on The Law of Torts* § 11 (5th ed. 1984) ("Prosser") (emphasis added). *See also* Harper & James § 3.7 ("Malice or ill will or bad motive, however, is unnecessary. . . . The intention to confine another person
[Footnote continued]

**Wrongful Entry or Eviction:** To support a claim for wrongful entry or eviction, also referred to as forcible entry and detainer, "it is indispensable that (a) the plaintiff have had peaceable possession and (b) that the defendant have employed force in the dispossession." 1 Harper & James § 3.15 at 388-89. *See also Glass v. Wiener*, 92 A.D.2d 584, 459 N.Y.S.2d 471 (1983) ("a cause of action to recover damages for forcible entry sounds in tort and reposes only in the person who had possession of the property"); *Quinn v. McCochrane*, 210 A.D. 569, 571, 206 N.Y.S. 550 (1924), *aff'd*, 240 N.Y. 661, 148 N.E. 748 (1925) (no evidence of forcible entry or detainer where there was "no proof of any force or threats used or of any intimidation on the part of the officers."). Forcible entry and detainer applies "only where the force employed to oust a tenant is unusual, tends to bring about a breach of peace, and the entry is with a strong hand, or by a multitude of people, or in a riotous manner, or with personal violence, or with threat and menace to life and limb." *Drinkhouse v. Parka Corp.*, 3 N.Y.2d 82, 91, 143 N.E.2d 767, 771 (1957). But intent to injure is not required: "In all states the landlord is liable if unreasonable means have been employed to effect an eviction." Harper & James § 3.15 at 387-88.

**Copyright Infringement:** In order for a plaintiff to prove a copyright infringement, he must prove two elements: "ownership of the copyright by the plaintiff and copying by the defendant." 4-13 *Nimmer on Copyright* § 13-01 (2006). "Notably absent from this formulation of the prima facie case is damage or any harm to plaintiff resulting from the infringement." *Id. See also Davis v. The Gap, Inc.*, 246 F.3d 152, 159 (2d Cir. 2001) (same). Indeed, contrary to Plaintiffs' assertion that the torts included in the definition of "personal and advertising injury"

---

will make the defendant liable to the person actually confined *although there is no desire or intent on the part of the defendant to harm the plaintiff.*") (emphasis added).

are all intentional torts, "intent is not an element of . . . copyright infringement." *Costello*

*Publishing Co. v. Rotelle*, 670 F.2d 1035, 1044 n.13 (D.C. Cir. 1981).

**Malicious Prosecution:** Malicious prosecution similarly does not require a plaintiff to

demonstrate that the defendant expected to inflict injury in order to state a claim.

> The elements of the tort of malicious prosecution are: (1) the
> commencement or continuation of a criminal proceeding by the
> defendant against the plaintiff, (2) the termination of the
> proceeding in favor of the accused, (3) the absence of probable
> cause for the criminal proceeding and (4) actual malice.

*Broughton*, 37 N.Y.2d at 457, 335 N.E.2d at 314. "Actual malice" in this context, however, is

not the same as intent to injure.

> The "actual malice" element of a malicious prosecution action
> does not require a plaintiff to prove that the defendant was
> motivated by spite or hatred, although it will of course be satisfied
> by such proof. Rather, it means that the defendant must have
> commenced the prior criminal proceeding due to a wrong or
> improper motive, something other than a desire to see the ends of
> justice served.

*Nardelli v. Stamberg*, 44 N.Y.2d 500, 502-03, 377 N.E.2d 975, 976 (1978). *See also* 1 Harper &

James § 4.6 at 499 ("it is not essential to prove such ill will. "[A]ny motive other than that of

instituting the prosecution for the purpose of bringing the party to justice, is a malicious

motive.").[3]

**Defamation:** Defamation does not require, of course, proof that the defendant intended

to inflict injury on the plaintiff. 2 Harper & James § 5.27 at 275 ("the element of malice in the

sense of bad or evil intention is not at all necessary to make the publication actionable. In fact,

---

[3] *See also* Restatement (Second) of Torts § 676 cmt. c (1977) ("it is not necessary to prove that the harassment was
itself motivated by ill will"); Prosser § 120 (" 'Malice' may consist of a primary motive of ill will, or a lack of belief
in any possible success of the action; but neither is necessary to it. It has been found where the proceeding was
begun primarily for a purpose other than the adjudication of the claim in suit, such as preventing an owner from
selling his land to another.")

malice really has nothing to do with the case."). Malice comes into play only when the defendant defends on the ground that his statements were subject to a qualified privilege, and the plaintiff seeks to nullify that claim through proof of malice. 2 Harper & James § 5.27 at 276 ("The conditions that will defeat the immunity afforded occasions qualifiedly privileged are usually called, collectively and generically, 'malice,' 'express malice,' or, at common law, 'actual malice.' "); *Park Knoll*, 89 A.D.2d at 168, 454 N.Y.S.2d at 904 ("A qualified privilege is . . . available only in the absence of malice.").

As this discussion makes clear, the torts covered under the definition of "personal and advertising injury" may be committed without the expectation of inflicting injury. The Policy's exclusion for such injury, therefore, does not render coverage illusory, but operates to bar coverage where, as here, the allegations charge that the insured expected or intended to injure.

### 2.      The "Eight-Corners Rule" Indisputably Governs this Case

As noted, Plaintiffs ask the Court not only to rewrite Hartford's Policy, but also to rewrite D.C. law. Yet it is indisputable that the "eight-corners rule," as recently reaffirmed by the D.C. Court of Appeals, governs this case. In apparent recognition that Hartford did not in fact have a duty to defend the Underlying Suit under the correct application of D.C.'s "eight-corners rule," Plaintiffs resort to the untenable argument that this Court "can and should" consider material extrinsic to the Underlying Complaint when assessing whether a duty to defend existed.[4] *See*

---

[4] Plaintiffs have attached several exhibits to their motion for summary judgment in an attempt to have the Court consider matters extrinsic to the Underlying Complaint. Those exhibits are irrelevant because, as discussed above, established D.C. law does not permit the examination of extrinsic material when evaluating whether an insurer has a duty to defend. However, even assuming, *arguendo*, that D.C. law permitted the court to look beyond the allegations of the underlying complaint, Plaintiffs' evidence does not, as they allege, establish Hartford's duty to defend the Underlying Suit. Plaintiffs' Op. Br. at 21. Indeed, the submitted extrinsic evidence does not advance Plaintiffs' argument, because it does not and cannot change the fact that the only way ConsumerLab could establish liability against the Plaintiffs was to allege and prove that the Plaintiffs initiated the CRN Petition as a pretext to inflict injury on ConsumerLab. In one instance, moreover, the material Plaintiffs offer serves to bolster Hartford's argument. *Id*. Exh. I at 7 n.4 (in a brief filed by Plaintiffs in the Underlying Suit, Plaintiffs themselves admit: "The complaint is replete with allegations of bad faith, malice and intent to injure.").

Plaintiffs' Op. Br. at 20. In so doing, Plaintiffs essentially request this federal Court to ignore binding precedent from D.C.'s highest court on an issue of D.C. law, notwithstanding the fact that this law has been consistently applied in D.C. for years. Further, Plaintiffs boldly ask this federal Court to *change* D.C. law regarding the "eight corners rule" by adding a "factual exception" to that existing, established D.C. precedent with no cognizable, supportable legal foundation for such a request and in contravention of basic, established legal principles governing the role of federal courts. In short, Plaintiffs' argument has no merit.

As Hartford outlined in its motion for summary judgment, in determining whether a duty to defend exists, D.C.'s "long standing case law requires [courts] to examine both the complaint and the insurance policy," which is known as the "eight corners rule." *Stevens v. United Gen. Title Ins. Co.*, 801 A.2d 61, 66, 66 n.4 (D.C. 2002). Under the "eight-corners rule," the allegations of the underlying complaint control the determination of whether there is a duty to defend: " 'The duty to defend depends only upon the facts as alleged to be,' so that the '[insurer's] obligations should be measured by comparing the policy it issued with the complaint filed [in the underlying case].' " *Travelers Indem. Co.,* 770 A.2d at 987. As a result, the "obligation to defend 'is not affected by facts ascertained before suit or developed in the process of litigation or by the ultimate outcome of the suit.' " *Id.* Therefore, D.C. law does not permit the examination of extrinsic evidence when analyzing whether a duty to defend exists; rather, the allegations of the underlying complaint control that analysis.

Plaintiffs, however, ignore the D.C. Court of Appeals' clear, unambiguous pronouncement of the applicable law and erroneously maintain that the D.C. Court of Appeals' decision in the *Stevens* case somehow indicates that that court would apply a "factual exception"

to the eight-corners rule in this case.  Plaintiffs' Op. Br. at 21-22.  Plaintiffs misread the *Stevens* case and seek to misapply it here.

In *Stevens*, the appellant argued, in the alternative, that the D.C. Court of Appeals should adopt a factual exception to the eight-corners rule.  801 A.2d at 70.  In response, a panel of the D.C. Court of Appeals, while noting that such a decision was best considered by the full court, expressly "reaffirm[ed] . . . adherence to the traditional 'eight corners' rule" and expressly declined to adopt a factual exception to the traditional rule.  *Id.* at 71, 63.  The Court of Appeals, therefore, did not leave any doubt as to what the controlling law in the District of Columbia is.

Indeed, the fact that the "eight corners" rule remains the governing law in the District of Columbia is evidenced by the application of this rule in cases that have come after *Stevens*.  For instance, in *I.J.G., Inc. v. Penn-America Ins. Co.*, the D.C. Court of Appeals, in a decision that followed the issuance of the *Stevens* opinion, applied the eight corners rule, stating that: " '[T]he duty to defend,' in short, 'depends only upon the facts as alleged to be' . . . . "  803 A.2d 430, 435 (D.C. 2002).  Nowhere in the *I.J.G.* opinion does the D.C. Court of Appeals refer to a "factual exception" to the eight corners rule, nor does the court suggest that the eight-corners rule is anything but settled, established law.

Moreover, this very Court recently interpreted the *Stevens* decision and found that "[t]here is no dispute that . . . the District of Columbia follows the eight-corners rule." *American Registry of Pathology v. Ohio Cas. Ins. Co.*, 461 F. Supp. 2d 61, 66 (D.D.C. 2006) (citing *Stevens*, 801 A.2d at 63); *see also id.* at 62 ("In the District of Columbia, an insurer's duty to defend is defined by comparing the allegations of a complaint with the terms of the insurance policy.  Facts outside those two documents, even if known to the insured and/or insurer, are not deemed relevant to the insurance company's duty to defend.").  While noting that some

jurisdictions have opted for a different rule, this Court asserted that the "District of Columbia is not among them; in fact, the D.C. Court of Appeals has recently reaffirmed its adherence to the rule." *Id.* at 70 (citing *Stevens*, 801 A.2d at 63). Additionally, in reference to the suggestion in *Stevens* that *en banc* consideration may be warranted, this Court concluded that "[d]espite this broad hint, the D.C. Court of Appeals has not considered the issue en banc and the eight-corners rule continues to apply in the District of Columbia." *Id.* at 67.

In sum, the eight-corners rule is not "obsolescent," as Plaintiffs contend, Plaintiffs' Op. Br. at 21; rather, it indisputably remains in full force today as the established, settled law of the District of Columbia, as this Court has expressly recognized. Accordingly, the eight-corners rule governs this case, and Plaintiffs may not employ extrinsic material to attempt to establish that Hartford had a duty to defend.

### 3. Because the "Eight-Corners Rule" Is Settled Law in D.C., an "*Erie* Prediction" Is Unnecessary and Improper

Since the "eight-corners" rule is the settled law of this jurisdiction, an "*Erie* prediction" by this federal Court as to how the D.C. Court of Appeals would rule with respect to that issue is unnecessary and not permitted under the law. Consequently, Plaintiffs' request that the Court make an "*Erie* prediction" that the D.C. Court of Appeals would apply a "factual exception" to the eight-corners rule in this case should be denied outright.

A basic precept of federal jurisprudence is the notion, as established by the Supreme Court in *Erie Railroad Co. v. Tompkins*, that in cases where state law governs, federal courts have a constitutional obligation to apply "the law of the State," as determined by the highest state court. 304 U.S. 64, 78 (1938); *see also Vandenbark v. Owens-Ill. Glass Co.*, 311 U.S. 538, 543 (1941) (stating that "the duty rests upon federal courts to apply state law under the Rules of Decision statute in accordance with the then controlling decision of the highest state court."). It

is only when the highest court of a state has not ruled on an issue that a federal court may attempt to predict how the state's highest court would rule. *See Commissioner v. Estate of Bosch*, 387 U.S. 456, 465 (1967) ("the State's highest court is the best authority on its own law. If there be no decision by that court then federal authorities must apply what they find to be the state law after giving 'proper regard' to relevant rulings of other courts of the State."); *see also Cellwave Tel. Servs. L.P. v. FCC*, 30 F.3d 1533, 1536 (D.C. Cir. 1994) ("Because no Delaware court has ever interpreted the relevant provision of Delaware law, the Commission set out to predict how the Delaware courts would decide the issue, much as a federal court might do in order to apply state law."); 17A James Wm. Moore, *et al.*, *Moore's Federal Practice* ¶ 124.22[3] (3d ed. 2006) ("When state law is unsettled, the federal court must attempt to predict how the state's highest court would rule if confronted with the issue.").

Where the state's highest court has ruled, however, federal courts are not empowered to modify or change established state law. "The Supreme Court has counseled that 'the proper function of [a] federal court is to ascertain what the state law is, not what it ought to be. . . .'" *Women Prisoners of the D.C. Dep't of Corrections v. District of Columbia*, 93 F.3d 910, 922 (D.C. Cir. 1996) (quoting *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941)); *see also Nationwide Mut. Ins. Co. v. Richardson*, 270 F.3d 948, 950 (D.C. Cir. 2001) ("We are mindful that a 'federal court . . . should normally decline to speculate on . . . a question of local doctrine.' "). More specifically, " '[a] federal court in a diversity case is not free to engraft onto those state rules exceptions or modifications which may commend themselves to the federal court, but which have not commended themselves to the State in which the federal court sits.' " *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 424 (D.C. Cir. 1988) (quoting *Day and Zimmermann*,

*Inc. v. Challoner*, 423 U.S. 3, 4 (1975)).  The D.C. Circuit explained "this fundamental rule of federal diversity jurisdiction," as follows:

> Absent some authoritative signal from the legislature or the [state courts], we see no basis for even considering the pros and cons of innovative theories. . . .  We must apply the law of the forum as we infer it presently to be, not as it might come to be. . . .  We see no basis for applying any rule other than the traditional one.

*Id.* (quoting *Dayton v. Peck, Stow & Wilcox Co.*, 739 F.2d 690, 694-95 (1st Cir. 1984)) (footnotes omitted).  *See also* 17A James Wm. Moore, *et al.*, *Moore's Federal Practice* ¶ 124.22[3] ("Because federal courts lack any inherent power to fashion state law through interpretation of state statutes or creation of common law rules, such as a state court might have, a federal court must be careful to avoid the temptation to impose on a state what that court or other jurisdictions consider to be wise policy.").

In sum, federal courts in diversity cases cannot arrogate to themselves the power to ignore existing authoritative state law, nor can they attempt to modify that law.  To the contrary, federal courts "take the law of the appropriate jurisdiction as [they] find it" and "leave it undisturbed."  *Tidler*, 851 F.2d at 424.

Since in this case, and as outlined above, D.C.'s highest court has consistently applied the eight-corners approach, and has recently reaffirmed its adherence to that rule, D.C. law with respect to this issue is settled and well-established.  Consequently, there is no need for this Court to make an *Erie* prediction as to how the D.C. Court of Appeals *would rule* on this issue because the D.C. Court of Appeals *has ruled.*  Moreover, this Court is not permitted to change D.C. law in contravention of the pronouncements of the highest court in D.C.; it simply cannot modify D.C.'s eight-corners rule to add a "factual exception."  A contrary conclusion would give to this Court more power than it has been granted under the law.

**D.    Examination of Extrinsic Evidence Does Not Affect the Result; Coverage Would Still Be Excluded Under the Hartford Policy**

Even if the Plaintiffs are correct that the examination of extrinsic evidence would be proper, it would not affect the result; the Hartford Policy would still exclude coverage. Nothing in the material submitted by the Plaintiffs changes the nature of the claim alleged against them— that Plaintiffs sought to petition the government to investigate ConsumerLab for illegitimate purposes, to "silence" ConsumerLab, to injure its reputation, to "maliciously initiate and conduct a widespread defamatory media campaign," and "to undermine [ConsumerLab] and its business." *See* Hartford Op. Br. at 6-7.

**1.    Plaintiffs' Reliance on the Underlying Court's Use of the Term "Actual Malice" Is Unavailing**

The Plaintiffs point to the underlying court's resolution of their motion to dismiss the Underlying Suit for support of their argument that the Underlying Suit did not allege that Plaintiffs expected to inflict injury. Specifically, Plaintiffs argue that because the underlying court did not dismiss ConsumerLab's defamation count, on the ground that ConsumerLab alleged "actual malice"—a term that Plaintiffs equate with "reckless disregard for the truth"— Plaintiffs necessarily were not alleged to have expected to injure ConsumerLab. *See* Plaintiffs' Op. Br. at 4. Plaintiffs apparently conclude that the underlying court's use of the term "actual malice" was a reference to *New York Times* or "constitutional malice," the type of malice a public figure must show to sustain a defamation action, rather than an allegation of spite, ill-will or intent to injure. Plaintiffs' conclusion is misguided; in any event, underlying court's use of the term "actual malice" does not alter whether Hartford had a duty to defend.

It is clear that the allegations of "actual malice" relied upon by the underlying court as grounds for upholding ConsumerLab's defamation claim were in fact allegations of "common law malice," not "constitutional malice." The Plaintiffs have fallen prey to a common

misunderstanding regarding the usage of the term "actual malice" in defamation law.  The

difficulty in understanding the law of malice in the context of a defamation suit stems from the

fact that there are two kinds of "actual malice": (1) " '[a]ctual malice'—*at common law*, also

known as 'common-law malice' " and (2) "'[a]ctual malice'—in its constitutional (First

Amendment) sense, also known as 'constitutional malice.' "  *Zaidi v. United Bank Ltd.*, 194

Misc. 2d 1, 12 n.3, 747 N.Y.S.2d 268, 274 n.3 (Sup. Ct. New York Co. 2002).  *See also*

*Friedman v. Ergain*, 110 A.D.2d 620, 487 N.Y.S.2d 109 (1985) ("To overcome the defense of

qualified privilege, it was necessary for plaintiff to make a showing that the defamatory

statements were published with actual malice, which is defined as personal spite, ill will, or

culpable recklessness or negligence."), *aff'd*, 66 N.Y.2d 645, 485 N.E.2d 1029 (1985).

Common-law malice is defined as "hatred, ill will, spite or wanton, reckless, or willful

disregard of the rights of another or the injurious effect of the defendant's conduct upon

another."  *Zaidi*, 194 Misc. 2d at 16, 747 N.Y.S.2d at 276 (relying on *Shapiro v. Health Ins.*

*Plan*, 7 N.Y.2d 56, 61, 163 N.E.2d 333, 336 (1959)); *see also Liberman v. Gelstein*, 80 N.Y.2d

429, 437, 605 N.E.2d 344, 349 (1992) ("Under common law, malice meant spite or ill will").

Unfortunately, "common-law malice" is sometimes called "actual malice," which is a term also

used to refer to "constitutional malice," that is, the type of malice relevant to defamation of

public figures.

Common law malice "is not concerned with a defendant's general feelings or past actions

toward the plaintiff, or even exclusive falsity of the statement, but rather the *defendant's*

*motivation for making the alleged defamatory statement.*"  *Zaidi*, 194 Misc. 2d at 17-18, 747

N.Y.S.2d at 276 (emphasis in original).  *See also Morsette v. The Final Call*, 309 A.D.2d 249,

255, 764 N.Y.S.2d 416, 421 (2003) (the " 'common law malice standard turns on the defendant's

attitude toward the plaintiff, and not toward the truth, it penalizes only those defendants who have *purposefully inflicted harm and have derived satisfaction from their wrongful acts.*'") (emphasis added); *Liberman*, 80 N.Y.2d at 439, 605 N.E.2d at 350 (common law malice refers to "the speaker's motivation for making the defamatory statements").

The context of the underlying court's reference to the term "actual malice" clearly demonstrates that the court was in fact referring to common-law malice with respect to the filing of the CRN Petition, not constitutional malice. In holding that the ConsumerLab had stated a cause of action for defamation, the underlying court noted that it could not find that the defamation claim was barred by the absolute privilege afforded pursuant to the *Noerr-Pennington* doctrine or Section 74 of the New York Civil Rights Law. Plaintiffs' Op. Br. Exh. B at 5. As Hartford explained in its opening brief, the only way ConsumerLab could state a defamation claim that would withstand a motion to dismiss, essentially barring a claim of absolute privilege pursuant to the *Noerr-Pennington* doctrine or Section 74 of the New York Civil Rights Law, was to allege that the Plaintiffs submitted the CRN Petition to the FTC illegitimately and as a pretext to injure ConsumerLab through a defamatory media campaign. It was on that basis that the underlying court made its determination that the defamation claim survived Plaintiffs' motion to dismiss. Thus, the court's refusal to dismiss ConsumerLab's defamation claim because it found sufficient allegations of "actual malice"—meaning common law malice, spite, ill-will—actually supports Hartford's argument that Plaintiffs were necessarily charged with intent to injure.

### 2.    ConsumerLab Continues to Allege that the Plaintiffs' Conduct Was a Sham

In the event this Court examines extrinsic material in evaluating Hartford's duty to defend, the Court should also consider ConsumerLab's continuing allegations that the Plaintiffs

submitted the CRN Petition to the FTC illegitimately and as a pretext or sham, in order to injure

ConsumerLab through a defamatory media campaign.

Despite the fact that the Underlying Suit was voluntarily dismissed, ConsumerLab

continues to allege that the Plaintiffs' conduct was a sham. In response to a press release issued

by CRN contending that ConsumerLab's decision to dismiss its defamation suit against the

Plaintiffs "vindicates CRN," ConsumerLab issued its own press release giving its own views on

the import of the dismissal. *See* ConsumerLab.com Responds to Vitamin Industry Claim to be

"Vindicated" in Defamation Case, http://www.consumerlab.com/news/news_111706_CRN.asp

(last viewed March 26, 2007) ("ConsumerLab Press Release") (attached as Exhibit 1 to the

Declaration of Patrick F. Hofer in Support of Hartford's Opposition to Plaintiffs' Motion for

Partial Summary Judgment). Dr. Tod Cooperman, President of ConsumerLab, noted that it is

important that the press "understand CRN's campaign against ConsumerLab, which

[ConsumerLab] believe[s] was designed to manipulate the press and consumers." *Id.*

In the ConsumerLab Press Release, ConsumerLab alleged that the Plaintiff's "actions

were part of an elaborate and well-planned campaign which, ConsumerLab believes, was

designed to undermine its credibility with journalists and the public—in essence, to silence it."

*Id.* The ConsumerLab Press Release includes specific examples of the actions taken by the

Plaintiffs that ConsumerLab believes were instituted ultimately for sole purpose of injuring

ConsumerLab's reputation. ConsumerLab alleges that:

- **CRN hired the firm Dezenhall Resources for a "3 to 4 month campaign"** beginning November, 2004 with a budget of up to $200,000. Dezenhall Resources is not an ordinary PR firm.
    - On its own website, Dezenhall explains, "We don't conduct corporate branding programs, but we do identify vulnerabilities and neutralize critics."

22

- o   Dezenhall was the focus of the April 17 Business Week article "The Pit Bull of Public Relations." The article cites examples of other campaigns against critics of industry.
- **CRN and/or Dezenhall developed a list of 94 journalists,** with a particular focus on those who had "Previously written on ConsumerLab.com." These journalists were specifically targeted to personally receive the CRN release about ConsumerLab.
- **Communications to this list were suggestive of an actual FTC investigation or action.** Emails carried subject heads such as "FTC – Shady 'watchdog'."

*Id.* ConsumerLab goes on to state that:

> CRN's members include many of the largest players in the $21 billion vitamin and supplement industry. ConsumerLab has reported problems with products from several of these companies. Compared to ConsumerLab, CRN's potential resources are virtually unlimited. Its members also include the two main competitors to ConsumerLab's Voluntary Certification Program.

*Id.*

Despite ConsumerLab's voluntary dismissal of the Underlying Suit, it continued to allege that the Plaintiffs initiated the FTC proceeding as a sham or a pretext for a defamatory media campaign designed to injure ConsumerLab's credibility and reputation with the public and the press.

## III.    CONCLUSION

The Underlying Complaint alleges actions on the part of Plaintiffs whose natural and probable consequence was the injury alleged, and it alleges that Plaintiffs intended to cause that injury. Moreover, alleging intent to injure was imperative for ConsumerLab's claims to succeed, because of the privileges that attached to Plaintiffs' statements in the CRN Petition and related public comment, *unless* the CRN Petition was submitted illegitimately and as a pretext to cause injury. It was therefore legally impossible for ConsumerLab to state a claim without alleging

that intent, putting the injury alleged in the Underlying Complaint fully within the exclusion under Hartford's Policy.

Accordingly, for all the foregoing reasons, Hartford respectfully requests that the Court deny Plaintiffs' motion for partial summary judgment, grant Hartford's motion for summary judgment declaring that it had no duty to defend the Underlying Suit, and enter judgment in favor of Hartford on all counts of the Complaint.

DATED this 26th day of March, 2007.


Respectfully submitted,

TROUTMAN SANDERS LLP


   /s/ Patrick F. Hofer
Patrick F. Hofer, Bar No. 412665
Tracy P. Varghese, Bar No. 472805
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 274-2950 (tel.)


*Counsel for Defendant Hartford Casualty Insurance Company*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COUNCIL FOR RESPONSIBLE NUTRITION and ANNETTE DICKINSON,<br><br>Plaintiffs,<br><br>v.<br><br>HARTFORD CASUALTY INSURANCE COMPANY,<br><br>Defendant. | Case No.: 1:06-CV-01590-RMC |

### DEFENDANT HARTFORD CASUALTY INSURANCE COMPANY'S COUNTERSTATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1, Defendant Hartford Casualty Insurance Company ("Hartford"), through undersigned counsel, hereby submits this Counterstatement of Material Facts in response to the Statement of Material Facts in Support of Plaintiffs' Motion for Partial Summary Judgment ("Plaintiffs' Statement"). As Hartford contended in its Motion for Summary Judgment, there are no material facts in dispute regarding whether Hartford had a duty to defend Plaintiffs in the underlying suit brought against them by ConsumerLab, and therefore the issue can be resolved as a matter of law. Hartford maintains that the undisputed material facts that are required to resolve the parties' cross-motions for summary judgment are set forth in its Statement of Material Facts as to Which There Is No Genuine Issue, which was filed with its Motion for Summary Judgment, and Hartford relies on that Statement.

Hartford contends that Paragraphs 22 to 29 of Plaintiffs' Statement contain facts that are not material to the resolution of the parties' cross-motions for summary judgment because they

involve matters extrinsic to the underlying complaint that the Court is not permitted to examine

when assessing whether Hartford had a duty to defend in the underlying suit, as explained in

greater detail in its accompanying Memorandum of Points and Authorities in Opposition to

Plaintiffs' Motion for Partial Summary Judgment ("Opposition Memorandum").  Additionally,

as detailed in Hartford's Opposition Memorandum, Paragraphs 7 to 10 and 15 of Plaintiffs'

Statement also relate to facts that are immaterial to the resolution of the parties' cross-motions

for summary judgment.


DATED this 26th day of March, 2007


Respectfully submitted,


  /s/ Patrick F. Hofer
Patrick F. Hofer, Bar No. 412665
Tracy P. Varghese, Bar No. 472805
TROUTMAN SANDERS LLP
401 9th Street, N.W., Suite 1000
Washington, D.C. 20004
(202) 274-2950 (tel.)

*Counsel for Hartford Casualty Insurance Co.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of March 2007, I caused a copy of Defendant

Hartford Casualty Insurance Company's Opposition to the Plaintiffs' Motion for Partial

Summary Judgment, the Memorandum of Points and Authorities in Opposition to Plaintiffs'

Motion for Partial Summary Judgment, the Counterstatement of Material Facts, and the

Declaration of Patrick F. Hofer to be served upon all counsel of record via ECF and electronic

mail as set forth below:

Janet K. Coleman
WHITNEY & BOGRIS, LLP
401 Washington Avenue
Towson, Maryland 21204
(410) 583-8000 (tel.)

/s/ Tracy P. Varghese
Tracy P. Varghese